Oreste CASALE, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 373, Docket 24476.

United States Court of Appeals Second Circuit.

Argued May 10, 1957.

Decided Sept. 5, 1957.

---

Maurice H. Greenberger, New York City (David Boyd Chase, New York City, on the brief), for petitioner.

Davis W. Morton, Jr., Atty., Department of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Ellis N. Slack, and I. Henry Kutz, Attorneys, Department of Justice, Washington, D. C., on the brief), for respondent.

Before CHASE, HINCKS and LUMBARD, Circuit Judges.

HINCKS, Circuit Judge.

This is a petition by the taxpayer for review of a decision of the Tax Court which affirmed the Commissioner's determination that an annual premium paid by O. Casale, Inc. (hereinafter called the Corporation) on a policy on the life of the taxpayer was a distribution to him of a taxable dividend in the year of its payment under Section 115(a) of the 1939 Code, 26 U.S.C.A. § 115(a).

The facts, which were stipulated, were fully stated in the Tax Court opinion from which the following summary is drawn.

During the taxable year, viz., 1950, petitioner was the president and principal stockholder of O. Casale, Inc., a New York corporation organized October 1, 1946, owning 98 of the 100 shares of its outstanding stock. The other shares were owned, one by his daughter, Philomena Casale, and one by an employee, Anna Prugner. Petitioner was also chairman of the Corporation's board of directors.

During the taxable year, the Corporation was engaged in the manufacture of topcoats, overcoats, and raincoats for various retail organizations. These organizations purchased their own material, had it cut, then the Corporation made it into the finished product. At no time since its incorporation did it pay any dividends to its stockholders, either in cash or in stock.

On December 7, 1948, when petitioner was 52 years old, a meeting of the Corporation's board of directors was held, at which the following directors were present: Petitioner Philomena Casale, and Anna Prugner. The minutes of the meeting stated its purpose to be the consideration of a pension plan for petitioner. A resolution was passed authorizing the Corporation to enter into a contract with petitioner, whereby it would obligate itself to pay him, upon certain stated contingencies, a certain monthly income upon his reaching the age of 65 years, or, if he should die prior thereto, a certain sum to his nominees or his estate.

On the same date, December 7, 1948, the Corporation entered into a deferred compensation agreement with petitioner as authorized. The agreement recited that inasmuch as petitioner "had rendered to the Corporation services in excess of the compensation paid therefor, and as the Corporation was indebted to him for a large measure of its success

and desired that he continue in his capacity as its president and treasurer, the parties agreed that additional, but deferred, compensation should be paid petitioner for the services rendered by him * * *."

Also on December 7, 1948, the Corporation applied to The Equitable Life Assurance Society (hereinafter referred to as Equitable) for a life insurance policy in the principal sum of $50,000 insuring petitioner's life for the benefit of the Corporation.

On December 13, 1948, Equitable issued the policy applied for, wherein the petitioner was designated as the insured. An annual premium of $6,839.50, commencing December 7, 1948, and coming due each December 7th thereafter until maturity of the contract, was provided. The December 7th upon which the insured's age at his nearest birthday was 65 years was agreed upon as the maturity date of the policy. It was further provided that prior to maturity, death benefits in the amount of $50,000 in the event of the insured's death, or the cash value of the policy at the end of the policy year in which the insured's death occurred, whichever was greater, were payable to the Corporation as beneficiary. Upon maturity, a monthly income payment of $500 was to be made to the insured for life or a 10 year certain period, whichever was longer. The Corporation was declared to be the owner of the policy. The Corporation possessed the right to assign the policy; the right to change its beneficiary; the right to receive dividends as declared by the insurer; and the right to borrow on the policy in an amount not exceeding its loan value.

The insurance contract recited the following amounts to be its cash values at the end of each policy year:

| End of Policy Year | Cash or Loan Value |
|---|---|
| 1 | 3,050.00 |
| 2 | 8,600.00 |
| 3 | 14,650.00 |
| 4 | 20,300.00 |
| 5 | 26,300.00 |
| 6 | 32,650.00 |
| 7 | 39,300.00 |
| 8 | 46,300.00 |
| 9 | 53,500.00 |
| 10 | 60,650.00 |
| 11 | 67,950.00 |
| 12 | 75,400.00 |
| 13 | 83,050.00 |

The Corporation paid the annual premium of $6,839.50 on said insurance policy for the years 1948, 1949, and 1950.

During 1950, the Corporation kept its books and reported its income on the cash receipts and disbursements basis. In computing its taxable income for such year, it did not claim a deduction for the premium it paid on the insurance contract, but charged it against earned surplus. The policy was always treated as an asset of the Corporation on its books.

During the year in question, petitioner did not include in his gross income any portion of the premium paid by the Corporation on the contract of insurance.

In his deficiency notice, respondent made the following determination:

"(a) It is held that the premium of $6,839.50 for the year 1950 paid by O. Casale, Inc., to the Equitable Life Assurance Society of the United States for a life insurance policy in the principal sum of $50,000.00 insuring the life of Oreste Casale is the equivalent of a distribution of a dividend and is therefore includable in * * * gross income."

In affirming, the Tax Court declared:

"Considering the features of the policy in conjunction with the provisions of the compensation agreement, we must conclude that the Corporation was no more than a conduit running from the insurer to petitioner, or his beneficiaries, with respect to any payments which might come due under the insurance contract. Essentially, petitioner stood in the same relationship to the policy as if he had taken it out himself and the Corporation had paid the premiums for him. The similarity in terms between the policy

and compensation agreement afford recourse to no other conclusion.

"The necessity for such a conclusion becomes more apparent when we consider the position petitioner occupied in relation to the Corporation. For all practical purposes he was the Corporation. He maintained complete dominion and control of its every move; and any future disposition of insurance proceeds would be subject to his assent and approval."

On appeal, the Commissioner has attempted to characterize this case as one which is determinable as a factual question. This explains the emphasis placed upon the Tax Court's finding of strong similarity between the agreement and the policy. But this is hardly a realistic approach to the problem at hand. For, if the resolutions had not been enacted simultaneously and the policy had not been applied for on the same day would not the Commissioner still contend for the result he seeks here? The argument in the supposed factual situation would be that the controlling shareholder sought to separate the several corporate actions taken merely to give them an air of corporate respectability thus masking the fact that the shareholder was in a position to carry on the Corporation's affairs in any manner he chose. So, the Commissioner would conclude, the situation should be treated in the same manner whether the corporate actions were separated or not. We do not place any weight on the corporate pattern adopted at the meeting in this case or in the rapidity with which events occurred. For these factors indicate only that the petitioner controlled the Corporation,—not that he *is* the Corporation.

Once having made this essential observation we may now proceed to state the issue before us which we conceive to be: Are corporate expenditures of a corporation actively engaged in business deemed to be proportionate distributions to controlling shareholders for tax purposes?

█ Despite the use of "sham" and other phrases to characterize the particular transaction under review, the record does not indicate any contention by the Commissioner that the Corporation itself is a sham or alter ego for all purposes. If such were the situation the corporate shell would be disregarded for tax purposes. Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596; Higgins v. Smith, 308 U.S. 473, 60 S. Ct. 355, 84 L.Ed. 406. It is clear that we are here concerned with a corporation actively engaged in the business of manufacturing coats in New York City, which had been in existence over two years when the agreement was entered into.

The finding of "sham" in this case was based solely upon the fact that the controlling shareholder could direct the activities of the Corporation and did so by expediting the corporate formalities and voting himself the benefits described. There is absolutely nothing else in the record indicating "sham" or a lack of "bona fides." On this basis the Commissioner maintains that the Corporation is necessarily a mere conduit for the whims and desires of this controlling shareholder and must be disregarded for tax purposes. This argument thus encompasses all corporations which are dominated by one or more controlling shareholders.

The Commissioner's position is also based upon an assertion, sustained by the Tax Court, that " * * * the insurance contract immediately inured to petitioner's benefit. * * * Upon payment of the first premium, petitioner received an immediate economic benefit in the form of a $50,000 life insurance estate, and a retirement annuity contract."

We think this conclusion demonstrably incorrect. Even after the Corporation purchased the policy the taxpayer still had nothing more than a contract right to his deferred compensation. At most, the policy indicated to the taxpayer what method the Corporation had chosen to enable it to live up to the contract ob-

ligation. The policy itself did not inure to the taxpayer's benefit nor was it earmarked for him. If business warranted, taxpayer's monthly retirement payments could have been made from general cash or a special reserve fund. The economic benefit to taxpayer was *not* in the form of a $50,000 life insurance estate, as such, but rather in another new corporate asset upon which he or his executor might levy if the Corporation should default on its contractual obligation.

In any event, there is no warrant for calling the benefit "immediate" for at best it was only tentative. Despite the Commissioner's efforts to show the illusory nature of the forfeiture conditions of the contract (*e. g.,*—voluntarily leaving the corporation's employ against the wishes of the corporation) we believe that the Corporation's insolvency would have terminated forever taxpayer's interest in the policy (if, indeed, he ever had any interest).

The pertinent provision of the agreement reads:

" * * * *provided,* however, that the said ORESTE CASALE and any person or persons designated by him to receive the above mentioned pension payments after his death and his estate shall forfeit all right to the said pension payments if the said ORESTE CASALE voluntarily leaves the employ of this CORPORATION, against the wishes of the CORPORATION, prior to the date upon which he attains the age of 65 years, or such earlier date for his retirement as may be agreed upon; it being understood that for the purposes of this agreement and for the accrual of his rights to the payments herein provided he will be deemed as continuing in the employ of this CORPORATION until he attains the age of 65, or until any other earlier retirement date agreed upon, if his employment is in fact terminated (1) by the CORPORATION without fault on his part, (2) because of this CORPORATION's insolvency or (3) because of any wrongful act or default on the part of the CORPORATION: and further provided that if the said ORESTE CASALE subsequent to such retirement accepts employment from any competitor of this CORPORATION, without the consent of this CORPORATION, all right to any further pension payments hereunder shall be forfeited by him and by any person or persons designated by him to receive such payments and by his estate."

The Commissioner, by brief, asserts that clause "(2)" in this excerpt indicates that the taxpayer was to "receive the payments provided irrespective of the rights of corporate creditors."

We think that the entire import of clause (2) is that if the taxpayer shall cease being employed by the Corporation because of the Corporation's insolvency this shall not be deemed a voluntary leaving of employment under the forfeiture provision of the section,—*i. e.,* if the Corporation should become insolvent, its contractual obligation remains in force. But this is a far cry from saying that during insolvency payments are to continue. The policy is a corporate asset in every sense of the word: as the Tax Court found, the Corporation paid the premiums and "possessed the right to assign the policy; the right to change its beneficiary; the right to receive dividends as declared by the insurer; and the right to borrow on the policy in an amount not exceeding its loan value." In the event of insolvency corporate creditors would be able to reach the policy as they might any other asset. Lincoln Nat. Life Ins. Co. v. Scales, 5 Cir., 62 F.2d 582. Taxpayer would at most have an unsecured claim under this contract and would share pro rata or he might even be subordinated to the claims of other creditors. See Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281.

The Commissioner and taxpayer are agreed that if the taxpayer had bought the policy with himself or his designees as beneficiaries and the Corporation had paid the premiums, the premiums would have been taxable to taxpayer. Para-

mount-Richards Theaters v. Commissioner, 5 Cir., 153 F.2d 602. The Commissioner argues that the situation here is not legally distinguishable; that since the taxpayer could have ordered the Corporation to buy the policy the result is as though he had bought it for himself. But this overlooks the impact of bankruptcy on the situation as discussed above: in Paramount-Richards the policy belonged to the individual and could not have been reached by corporate creditors.

Also, under the cash value table, set forth above, if taxpayer had died between the ninth and the thirteenth year of the policy, the Corporation would have received an amount well in excess of $50,000 but could satisfy its contract obligation by the payment of only $50,000. This is a clear indication that taxpayer had no legal interest in the policy.

In Cummings v. Com'r, 1 Cir., 73 F. 2d 477, a company insured the life of its president. Pursuant to resolution, the proceeds received upon his death were distributed as a dividend to the common stockholders. None of these reported the dividend as income. They claimed that the company was acting as their agent or trustee in this matter and that they were the real beneficiaries of the policies. The Court rejected their contention and cited the following example:

"* * * To put the matter in its most simple form, it seems an analogous case would be one where A, having an insurable interest in the life of B, promises C that he will take out insurance on B's life payable to himself and that, when B dies and the proceeds of the policy are received, he will pay them over to C. It would seem clear in that case that C would have no interest in the policy and its proceeds until the money got into the hands of A, and no legal interest then unless there was a good consideration for A's promise, in which case the right of C to the funds would arise by virtue of his contract with A and not of the policy itself" (at page 480).

The case at bar is even a clearer one for not disregarding the corporate entity. Here the contract does not require payment over of the proceeds of the policy: the corporate obligation will be satisfied by funds from any source.

Although not precisely in point, Lewis v. O'Malley, 8 Cir., 140 F.2d 735, and all cases which refuse to treat a closely controlled corporation as a mere conduit, would have to fall if the Commissioner prevailed here. In that case, the corporation, under the Commissioner's theory, would be treated as a mere conduit so that the principal stockholder would be held to receive benefit from the corporate expenditure he made as its agent.

We have seen that taxpayer has received no immediate personal benefit from the corporate purchase of the policy. We have been cited to no case or legislative provision which supports the proposition that the entity of a corporation which is actively engaged in a commercial enterprise may be disregarded for tax purposes merely because it is wholly owned or controlled by a single person.

Reversed.