McNAIR REALTY COMPANY, a corporation, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. No. 2001.

United States District Court
D. Montana,
Great Falls Division.

Nov. 1, 1960.

H. Cleveland Hall, Edward C. Alexander and John C. Hall, Great Falls, Mont., for plaintiff.

Charles K. Rice, James P. Garland, Lyle M. Turner, and Jerome S. Hertz, Washington, D. C., and Krest Cyr, Butte, Mont., for defendant.

JAMESON, District Judge.

This is a suit for the recovery of federal income taxes and assessed interest in the amount of $38,411.48, together with statutory interest, paid under protest by the plaintiff corporation for the calendar year 1952.

During that year an interest in a certain building owned by the taxpayer corporation was transferred by the corporation to one of its stockholders, followed by a sale by the corporation and the stockholder. The corporation paid a capital gains tax on the interest it retained, and the stockholder paid the tax on the interest transferred to him. The Commissioner of Internal Revenue determined that, in substance, the taxpayer corporation itself sold the building and was accordingly taxable upon the entire gain from the sale of the building under sections 22(a), 111, 112(a), and 117 of the Internal Revenue Code of 1939, 26 U.S.C.A. §§ 22(a), 111, 112(a), 117.[1] The question presented is whether there was a "genuine liquidation", followed by a sale by the stockholder, in which case the only tax would be that payable by the stockholder under section 115(c)[2] and 117, or whether the property was, in substance or in fact, sold by the corporation, with the proceeds thereafter distributed to the stockholder, in which case a capital gains tax would be payable by both the corporation and the stockholder.

McNair Realty Company, the plaintiff, is a Montana corporation which was organized in 1933. Prior to September, 1952, all of its outstanding stock, with the exception of two qualifying shares, was owned in approximately equal shares by Chester S. McNair, Ben P. McNair, Jr., and Sarah McNair Carnahan. The assets of the corporation consisted primarily of improved real estate, held as an investment. These real estate holdings were managed on a fee and commission basis by the B. P. McNair Company, a partnership organized in 1923[3] and engaged in the property management business, having some twenty clients, including the plaintiff. The McNair brothers (Ben and Chester) were equal partners in the firm from 1949 until late in 1952,

[1]. Section 22(a), Int.Rev.Code 1939 defines "gross income" to include "gains * * * from * * * sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property * * *". Section 111 prescribes the method of determining the amount of, and recognition of, gain or loss. Section 112(a) provides that upon the sale of property the entire amount of gain or loss determined under section 111 shall be recognized, except with respect to exchanges of property not here applicable. Section 117(a) (4) defines long-term capital gain, and 117(c) prescribes the method of determining the amount of long-term capital gain in the case of corporations.

[2]. Section 115(c), Int.Rev.Code 1939 provides in pertinent part: "(c) (As amended by Sec. 147, Revenue Act of 1942, c. 619, 56 Stat. 798). *Distributions in Liquidation.*—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112. * * *" 26 U.S.C.A. § 115(c).

[3]. B. P. McNair, Sr., the father of Chester S. McNair (hereinafter referred to as "Chester") and Ben P. McNair, Jr. (hereinafter referred to as "Ben"), was engaged in the real estate brokerage and insurance business from 1893 until his death in 1923, when Chester, Ben, and W. R. Gilchrist formed a partnership and purchased the business from the elder McNair's estate. The partnership managed the property of the estate and continued to manage it for Mrs. B. P. McNair, Sr. until her death in 1933, when the plaintiff corporation was organized by her three heirs to take over the assets of her estate. W. R. Gilchrist retired from the partnership in 1949.

when Ben retired. Chester served as president, and Ben as secretary of the taxpayer corporation. Chester, Ben, and Kenneth Dunlap, an accountant, were directors of the corporation.

In 1947 or 1948, Ben first expressed his desire to dispose of his interest in the corporation, and the matter was discussed by the brothers from time to time thereafter. By reason of heart attacks in 1950 and again in February, 1952, Ben was advised by his doctor that he should not spend his winters in Montana. He also became interested in the purchase of oil and gas leases and needed funds for that purpose. By reason of these facts, his desire to dispose of his interest in both the corporation and partnership was strengthened.

Among the assets of the taxpayer corporation was property in Great Falls known as the Duval-Wallace Building. In March, 1952, the partnership received a letter from Junius Tribe, a Utah real estate broker, inquiring as to whether this building was for sale. The partnership, by C. S. McNair,[4] answered, stating: "We have not and are not, offering the property for sale and for that reason do not wish to set a price on it. However, any offer, large enough to be interesting, would be given careful consideration." Tribe replied with a tentative offer of $200,000. C. S. McNair, replying on behalf of the partnership, stated that he had "neither the authority nor the disposition to fix an asking price on this property nor to offer it for sale", but that he was quite sure that "on account of their tax situation, the figure you mention of $200,000 would not interest the owners". The letter continued: "On the other hand, however, I do think that $225,000 would be of interest particularly if it were net as far as commission was concerned. * * * If your people care to submit a firm offer with some sort of guarantee of good faith, we can promise to take it up with our stockholders in a serious way and get a firm acceptance or rejection."

Tribe countered with a proposal of $210,000. Chester again replied for the partnership, saying in part: "Your figure comes very close to being one which we could take up with our sister and recommend her acceptance. * * * We have not consulted our tax man but it might be necessary for us to take payment over a period of time."[5] After further negotiations, there was delivered to Tribe personally on June 18, 1952, a letter from the partnership, reading as follows:

"This letter is in confirmation of our various conversations of today and in connection with correspondence previously had between your office and ours in regard to the sale of the Duval-Wallace property in Great Falls.

"The firm offer of $210,000.00 contained in your letter of May 19 was flattering enough that we gave the matter most serious consideration. We find, however, that from both a tax and investment standpoint it would be unwise for us to accept less than $225,000.00.

\* \* \* \* \* \*

"Heretofore, we have refused to place a selling price on the property but for the purpose of this transac-

---

4. The first letter from Tribe was addressed to "B. P. McNair Company" and started "Dear Ben:". Tribe had conferred personally with Ben prior thereto. All letters addressed to Tribe were signed "B. P. McNair Company, C. S. McNair"; and all subsequent letters from Tribe were addressed either to C. S. McNair or B. P. McNair Company, attention C. S. McNair.

5. This letter continued:

"To sum up. Your proposal is almost, but not quite, tempting enough for us to go into it seriously with our sister. If your people can see their way to a 10% increase on the figure mentioned and will put it in the form of a firm offer, net to us, we will take the matter up with her and get you a speedy answer.

"Once again I wish to caution you that this letter is not to be construed as an offer by us. We have neither the authority nor the disposition to set any price."

tion only and because of your interests and efforts, we are agreeable to placing a figure on the property of $225,000.00 subject only to confirmation by our corporation.

"This proposal will hold good until midnight of June 27, 1952.

"It should also be understood that there are details of a mortgage loan to be worked out and that we would reserve the right to make any transfer to our best advantage tax wise. By this is meant a down payment of less than thirty percent or a possible transfer first to an individual and then to your principal or whatever appears most feasible. * * *

* * * * * *

"We will hold this as a commitment for you for the time mentioned. In the event it proves acceptable to your people, please give us written acceptance accompanied by a check in the amount of $25,000.00."

Tribe replied on June 26, 1952, making "formal acceptance of your offer of sale" on behalf of his principal, and enclosing check for $25,000 payable to the partnership. The check was immediately deposited in the partnership bank account.

The Duval-Wallace Building was included in a blanket mortgage covering all of the corporate property. During the latter part of July, the corporation secured the consent of the mortgagee to a release of the Duval-Wallace Building on certain minor conditions. This was done without any formal corporate action.

A special meeting of the directors of McNair Realty Company was held on September 2, 1952, the first for that calendar year. At this meeting, Chester, Ben, and Kenneth V. Dunlap, comprising all members of the board, were present.[6] A resolution was adopted (Ben not voting) authorizing the officers of the corporation to execute and deliver to B. P. McNair, Jr., a warranty deed on behalf of the corporation to a 63.556 percent interest in the Duval-Wallace Building upon the surrender and delivery of 333 shares of capital stock of the corporation, "such deed to be in full liquidation of the interest of B. P. McNair, Jr. as a stockholder in the corporation".

On September 10, 1952, Chester, Ben, their attorney, and Dunlap met with William B. Finlay, a certified public accountant, and consulted him with regard to the tax effects of the proposed transaction.[7] Finlay had also been consulted by Ben in June, 1952. Finlay testified that "he (Ben) was considering disposing of his stock or liquidating his stock in the McNair Realty Company, and he wanted to

6. According to the minutes of this meeting, Ben expressed his intention to enter into business for himself and stated that his new venture would require the outlay of a considerable sum of money. Accordingly, he desired to convert his 333 shares of stock into cash and liquidate his interest in the company. He stated that he was willing to dispose of his stock for $143,000. The president (Chester) suggested that Ben's stock be exchanged for a partial interest.in the Duval-Wallace Building, which he valued at $225,-000; that an interest in the building equal to 143/225 or 63.556% be transferred to Ben; and that Ben's overdraft of approximately $18,000 be repaid out of "any moneys eventually received for his interest in the building".

7. Finlay testified in part:
"Q. * * * Mr. Finlay, at that conference held on September 10th, 1952, were you advised that the Duval Wallace property was at that time listed for sale with the B. P. McNair Company partnership? A. That was my understanding, and it was my further understanding that the real estate agents conducted all of the repairs and looked after the management of all of the McNair properties. I had known that for some time.

"Q. Specifically the item that the property was at this time listed for sale, do you recall how you acquired that impression? Were you so informed? A. It is my recollection that that is exactly what happened, that I was told that it was listed for sale.

"Q. Do you recall by whom you were told? A. From whom I got the information?

"Q. Yes? A. Well, I got it during this conference. I don't remember from whom, from one of those who participated in the conference, other than myself."

know about what the tax basis of it would be, and I explained to him at that time".[8]

Another meeting of the plaintiff's board of directors was held on September 17, 1952, the minutes reciting that there were present C. S. McNair and Kenneth V. Dunlap (constituting all of the members of the board).[9] The officers were directed to take all necessary steps for the sale of the Duval-Wallace Building for at least $225,000, to execute and deliver a deed covering the interest of the corporation to the purchaser, to appoint "B. P. McNair Co. (a partnership)" to act as agent for the sale, and "in the event such sale is made to pay to the McNair Realty Corporation and B. P. and Eloise McNair, owners, the proceeds of the sale of the property as their interest may appear * * *".

On September 25, 1952, at 9:20 A.M., there was recorded a warranty deed from the corporation to Ben conveying a 63.-556% interest in the Duval-Wallace property. At 9:26 A.M. there was recorded a deed from the corporation and Ben conveying this property to Tribe's purchaser.[10] The balance of the purchase price, which was received on that date, was deposited to the partnership account. The partnership later distributed the proceeds to Ben and the corporation in proportion to their record interests.

In its federal income tax return for the year 1952, the taxpayer corporation computed its capital gain from the sale of the Duval-Wallace property on the basis that it had owned and sold only approximately 36 percent of the building. The Commissioner of Internal Revenue determined that, for tax purposes, the corporation was chargeable with the entire proceeds of the sale, and that it should have computed its capital gains accordingly. Plaintiff paid the deficiency assessed against it, and is suing for a refund.

Defendant contends that in substance the entire property was sold by the taxpayer corporation, which thereafter distributed 64 percent of the proceeds to Ben in liquidation of his stock interest, that the only purpose of the distribution of an interest in the property to Ben was to permit its conveyance to a purchaser previously obtained by the corporation on terms previously agreed upon, and that accordingly "the transaction should be treated as a corporate sale of assets followed by a distribution of the proceeds of the sale to the stockholder".

Plaintiff contends that the transfer of the 64 percent interest to Ben was a "genuine liquidation", followed by a sale, and that the corporation had no negotiations with the purchaser of the property prior to liquidation, but that all negotiations were conducted by B. P. McNair Company, a partnership, which was a distinct entity.

Under either theory of the case, Ben was required to pay, and did pay, a capital gains tax upon the difference between the cost basis of his stock interest and the gain he received in liquidation of that interest, i. e., the difference between the cost basis of his stock and the market

8. Finlay testified further:

"Q. And you discussed with him the tax situation which would result upon the liquidation of his stock? A. I explained the liquidation on 115C of the 1939 code and I told him on account of his holding the stock more than six months he was subject to a 26% capital gains tax."

9. The minutes of this meeting recite the conveyance of a 63.556% interest in the Duval-Wallace Building to Ben and his surrender to the corporation of 333 shares of capital stock, and include the following: "The next matter to come before the board was a discussion as to the advisability of selling their interest (in the Duval-Wallace Building). The president stated that the reason for such consideration was that B. P. McNair, Jr., now the owner of a 63.556% interest in said building, found it necessary to have cash funds available much sooner than he had anticipated and as the building would probably bring a top price at this time, he was desirous of disposing of his interest in said building."

10. The deed from the corporation to Ben was dated September 15, 1952, and acknowledged September 24, 1952. The deed to Tribe's purchasers was dated and acknowledged September 24, 1952.

value of the property he received. Under plaintiff's theory, the capital gains tax payable by plaintiff would be limited to the 36 percent interest which it retained upon the liquidation and subsequently sold.[11] Under defendant's theory, plaintiff would pay a capital gains tax on the entire interest in the Duval-Wallace property, i. e., the difference between the cost basis to the corporation and the entire amount received upon the sale. In other words, the 64 percent interest conveyed to Ben would then be taxable at both the corporate level and the stockholder level.

Defendant relies primarily upon Commissioner v. Court Holding Co., 1945, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981; and plaintiff relies primarily upon United States v. Cumberland Public Service Co., 1950, 338 U.S. 451, 70 S.Ct. 280, 94 L.Ed. 251. It is necessary, accordingly, to consider carefully the facts and the holding in each of those cases.

In Commissioner v. Court Holding Co., [324 U.S. 331, 65 S.Ct. 708] all of the outstanding stock of a corporation was owned by a husband and wife, who had organized the corporation in 1934 "solely to buy and hold the apartment building which was the only property ever owned" by the corporation. Between October, 1939, and February, 1940, there were negotiations for the sale of the property between the corporation and ultimate purchaser. An oral agreement was reached as to terms and conditions of sale on February 22, 1940. When the parties met to reduce the agreement to writing, the purchaser was advised by the corporation's attorney that the sale could not be consummated because it would result in the imposition of a large income tax on the corporation. The following day

the corporation declared a "liquidating dividend", which involved a complete liquidation of its assets and surrender of all outstanding stock. The property was then deeded to the two stockholders who entered into a sale contract on substantially the same terms and conditions previously agreed upon. A $1,000 down payment made a month and a half earlier to the corporation was applied in part payment on the purchase price.

The Tax Court, 2 T.C. 531, concluded that the declaration of the "liquidating dividend" followed by the transfer of legal title were mere formalities designed "to make the transaction appear to be other than what it was" in order to avoid tax liability. The Supreme Court held that there was evidence to support the findings of the Tax Court, that its findings must therefore be accepted by the courts,[12] and that on the basis of the findings the Tax Court was "justified in attributing the gain from the sale to respondent corporation". The Court continued:

> "The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title." 324 U.S. 334, 65 S.Ct. 708.

In United States v. Cumberland Public Service Co., supra, certiorari was

11. If the transfer of the 64% interest to Ben was a liquidation, it would not be taxable to the corporation. See Treas. Reg. 103, § 19.22(a)–21, which reads in part: " * * * No gain or loss is realized by a corporation from the mere distribution of its assets in kind in partial or complete liquidation, however they may have appreciated or depreciated in value since their acquisition." See Gen-General Utilities & Operating Co. v. Hel- vering, 1935, 296 U.S. 200, at page 206, 56 S.Ct. 185, at page 187, 80 L.Ed. 154.

12. The Court pointed out that the Court of Appeals, 5 Cir., 143 F.2d 823, "drawing different inferences from the record, held that the corporation had 'called off' the sale, and treated the stockholders' sale as unrelated to the prior negotiations".

granted "to clear up doubts arising out of the Court Holding Co. case". In the Cumberland case, the respondent, a closely held corporation, was engaged in the business of generating and distributing electric power. It becoming apparent that the corporation was unable to compete with TVA power, its shareholders, "realizing that the corporation must get out of the power business", offered to sell all of the corporate stock to a cooperative. The cooperative refused to buy the stock but offered to purchase the transmission and distribution equipment. "The corporation rejected the offer because it would have been compelled to pay a heavy capital gains tax". At the same time the shareholders "offered to acquire the transmission and distribution equipment and then sell to the cooperative. The corporation transferred the transmission and distribution systems to its shareholders in partial liquidation. The remaining assets were sold and the corporation dissolved. The shareholders then executed the previously contemplated sale to the cooperative". 338 U.S. 452, 453, 70 S.Ct. 281.

The Commissioner assessed and collected a tax from the corporation "on the theory that the shareholders had been used as a mere conduit for effectuating what was really a corporate sale * * * The Court of Claims found that the method by which the stockholders disposed of the properties was avowedly chosen in order to reduce taxes, but that the liquidation and dissolution genuinely ended the corporation's activities and existence". 338 U.S. 453, 70 S.Ct. 281.

In affirming, the Court said in part:

"While the distinction between sales by a corporation as compared with distribution in kind followed by shareholder sales may be particularly shadowy and artificial when the corporation is closely held, Congress has chosen to recognize such a distinction for tax purposes. The corporate tax is thus aimed primarily at the profits of a going concern. This is true despite the fact that gains realized from corporate sales are taxed, perhaps to prevent tax evasions, even where the cash proceeds are at once distributed in liquidation. But Congress has imposed no tax on liquidating distributions in kind or on dissolution, whatever may be the motive for such liquidation. Consequently, a corporation may liquidate or dissolve without subjecting itself to the corporate gains tax, even though a primary motive is to avoid the burden of corporate taxation.

"Here, on the basis of adequate subsidiary findings, the Court of Claims has found that the sale in question was made by the stockholders rather than the corporation. The Government's argument that the shareholders acted as a mere 'conduit' for a sale by respondent corporation must fall before this finding. The subsidiary finding that a major motive of the shareholders was to reduce taxes does not bar this conclusion. Whatever the motive and however relevant it may be in determining whether the transaction was real or a sham, sales of physical properties by shareholders following a genuine liquidation distribution cannot be attributed to the corporation for tax purposes. 338 U.S. 454, 455, 70 S.Ct. 282.

From these two Supreme Court cases, the following principles or guideposts are established:

1. The trial court should look beyond the papers executed by the corporation and stockholders to determine whether the sale was actually made by the corporation.

2. Where a sale is in fact or in substance made by the corporation, the corporation is subject to a capital gains tax on the transaction, and taxes may not be avoided by using the stockholders "as a conduit through which to pass title".

3. Where, however, the sale is not made by the corporation, but by the stockholders, and there is a "genuine liquidation" prior to sale, the corporation may not be taxed on the transfer.

4. A corporation may liquidate or dissolve without subjecting itself to the capital gains tax, even though a primary motive is to avoid taxes.

Both parties have cited numerous cases.[13] None are precisely in point factually, and each party distinguishes those cited by the other. It is clear from the Cumberland case that it is a question of fact whether there was a genuine liquidation—a problem that is often difficult of solution. This is well illustrated by the following statement in 2 Mertens, Law of Federal Income Taxation, Chap. 17, page 26, § 17.05a:

> "The decision of the Supreme Court in the Cumberland case that the question whether a sale was taxable to the corporation or to the stockholders was one of fact did not settle the problem as is shown by a decision of the Tax Court where a majority of the Court held that the facts disclosed a 'genuine liquidation,' while the five dissenters found that the shareholders merely indulged in 'carefully cloaked ritualistic formalities.' The Tax Court has held that a sale will be deemed made by the shareholders on their own behalf where the facts establish that the corporation did not authorize, negotiate, or make any sale of its property prior to the liquidation; and the distribution in liquidation was genuine. Further, the Tax Court has held that the fact that some of the negotiations preceded the liquidation was not determinative of the question, where the evidence showed that the sale was actually made by the stockholders following the liquidation."

In support of this statement, Mertens relies primarily upon Doyle Hosiery Corp. v. Commissioner, 1951, 17 T.C. 641. In that case John J. Doyle owned 3,900 of 4,000 shares of common stock and all of the preferred stock in taxpayer corporation. His wife and daughter each owned 50 shares of common. Doyle was contacted by a broker and gave permission to show the hosiery plant and proposed a selling price of $500,000. He was advised by his attorney that in view of the possible tax consequences, the corporation should be liquidated. Following negotiations between counsel for Doyle and the purchaser, counsel completed a draft of a sales agreement on June 18. On the same day the Doyle family met as directors of the corporation and adopted a resolution authorizing dissolution. Thereupon, and in complete liquidation of the corporation, its assets were conveyed to the stockholders. Subsequently, on the same afternoon, the stockholders executed an agreement to sell. The purchaser began operating the plant on the same day. A down payment of $50,000 was made on June 18 in the form of a certified check dated June 16, payable to

13. Of the twenty-seven federal cases cited by both parties, eleven were decided before Court Holding, supra, seven between Court Holding and Cumberland, and nine after Cumberland. Of the nine cases decided after Cumberland, which of course are the most persuasive, five were decided by the Tax Court in favor of the taxpayer on the ground that the sale of corporate assets after a liquidation was in fact made by the stockholder or stockholders instead of by the corporation. These are Gilman v. Commissioner, 1950, 14 T.C. 833; Amos L. Beaty & Co. v. Commissioner, 1950, 14 T.C. 52; West Coast Securities Co. v. Commissioner, 1950, 14 T.C. 947; Doyle Hosiery Corp. v. Commissioner, 1951, 17 T.C. 641 (discussed infra); and Merkra Holding Co., Inc. v. Commissioner, 1956, 27 T.C. 82 (discussed infra). Of the other four

cases decided after Cumberland, Casale v. Commissioner, 2 Cir., 1957, 247 F.2d 440 (a case involving a deferred compensation agreement with the president and principal stockholder of a corporation where the court rejected the Commissioner's contention of "sham" on the theory that the corporation was a mere conduit for the controlling stockholder), and United States v. Mattison, 9 Cir., 1959, 273 F.2d 13 (involving application of so-called Kimball-Diamond Rule in transaction where taxpayer is primarily interested in corporate assets and first purchases stock and then liquidates to acquire the desired assets), are not in point; and Jones v. Grinnell, 10 Cir., 1950, 179 F.2d 873, and Donner v. Commissioner, 2 Cir., 1955, 227 F.2d 381, are distinguishable on the facts.

Doyle personally, which was deposited in his personal account. Final payment was made on July 3, and the assets were then conveyed to the purchaser in conformity with the sales agreement. Upon these facts the Tax Court found that prior to the adoption of the resolution to dissolve and distribute the assets to the stockholders in liquidation on June 18, the corporation "did not consider, authorize, negotiate, or enter into any agreement for the sale of its assets and, further, that although some of the negotiations by the stockholders preceded liquidation, the sale of the properties involved was made by the corporation's former stockholders as the individual owners thereof following liquidation". It was held accordingly that the decision in the Cumberland case was controlling.

Many of the cases construing Court Holding Co. and Cumberland were reviewed by the Tax Court in Merkra Holding Co. v. Commissioner, 1956, 27 T.C. 82. The applicable rule was well summarized as follows:

> "It is not necessary to reconcile all of the litigated situations where it has been held the stockholders' sales after liquidation in kind were or were not attributable to the corporation. Certain it is from all of the authorities the sale cannot be attributed to the corporation unless the corporation has, while still the owner of the property, carried on negotiations looking toward a sale of the property, and in most cases the negotiations must have culminated in some sort of sales agreement or understanding so it can be said the later transfer by the stockholders was actually pursuant to the earlier bargain struck [14] by the corporation —and the dissolution and distribution in kind was merely a device employed to carry out the corporation's

agreement or understanding." At page 92.

Do the facts here bring the case within the ambit of the Court Holding Co. case and justify a finding that the sale was actually made by the corporation prior to liquidation, or do they show a "genuine liquidation", followed by a sale within the rules of the Cumberland case? There is little dispute as to the facts. The contentions arise regarding the inferences to be drawn from the facts and the emphasis to be placed upon particular facts.

This is not a case where, as in Court Holding Co., the corporation negotiated the sale and obtained a check payable to the corporation as a down payment, and after arriving at an oral agreement, learned from its tax counsel that the consummation of the sale would involve serious tax consequences, and then attempted to avoid tax liability by liquidation followed by a sale. Here Chester and Ben were well aware of the tax problem before arriving at any agreement and specifically mentioned it in letters to Tribe, making it clear (1) that any sale would be subject to approval of the corporation, and (2) that the transaction would be handled to the best advantage tax-wise, which might mean "a transfer first to an individual and then to your principal * * *".

Before any proposal was submitted to the corporation for formal action, Chester and Ben had consulted their attorney and accountant regarding the tax consequences. The only dates definitely fixed were the conference with Finlay on September 10, 1952, and a conference with Dunlap, the corporation accountant (and also its vice president) on June 24, "which had to do with the transfer of Ben's stock for a portion of the Duval-Wallace Building". This was prior to Tribe's letter of acceptance.

14. The court referred to Fairfield S.S. Corp. v. Commissioner, 2 Cir., 1946, 157 F.2d 321, 322, where Judge Learned Hand had said that Commissioner v. Court Holding Co. "turned upon the fact that all the preliminary negotiations had been made expressly with the corporation; and that it was only after the bargain had been struck, that the device of a liquidation was brought in as deus ex machine."

Dunlap recalled conferences with Chester in which the sale of the Duval-Wallace Building was discussed but could not fix any definite dates. He recalled making a rough estimate of the tax and that he and Chester "determined that it would be prohibitive for the corporation to sell that building because of income taxes". Chester thought he had consulted the attorney and accountant early in the proceedings, possibly in May or June, and testified that "we couldn't even talk about selling this until we found what the tax complications might be".[15] Whenever these conferences were held, it is clear that before action by the corporation, competent accountants and legal counsel were consulted. Presumably they were aware of both Court Holding Co. and Cumberland and had those cases in mind in their advice to Chester and Ben.

The relationship of the parties of course presents a complex situation. Chester and Ben were two of three equal stockholders of the taxpayer corporation, two of its three directors, and its president and secretary. They were also equal partners in B. P. McNair Co., a partnership of long standing, antedating the organization of the corporation, which acted as a broker on a fee and commission basis in managing the property of the corporation and some nineteen other clients. The defendant contends in effect that even though the partnership may have been a separate entity, Chester and Ben were in fact acting for the corporation in negotiating with Tribe, either as officers of the corporation or as its agent.

It is true, as defendant contends, that the corporation by formal action had employed the partnership "as real estate agents and managers for the corporation",[16] and this fact was generally known. It is true also that the partnership had on prior occasions sold corporate property subject to later ratification and confirmation by the corporation. In those cases, however, the sales had actually been made and conveyances executed by the officers of the corporation.

While the partnership was authorized to act as real estate agent and manager for the corporation, it could not bind the corporation, and there is no evidence here that the officers attempted to do so, as they had done on prior occasions where the partnership sold corporate property subject to later confirmation by the corporation. Here no agreement, of any kind was executed by the officers, and the letter agreement between the partnership and Tribe made it clear that any agreement was subject to corporate approval. Nor does the fact that the members of the partnership were also stockholders and officers of the corporation necessarily make the transaction a corporate sale.[17]

15. This testimony is consistent with the statement in the partnership's letters to Tribe. The letter of May 26, 1952, said in part, "Tax-wise, however, and from an accounting standpoint, we are in something of a dilema", and, "We have not consulted our tax man, but it might be necessary for us to take payment over a period of time". The letter of June 18 contains the statement that, "It should also be understood that * * * we would reserve the right to make any transfer to our best advantage tax-wise. By this is meant a down payment of less than thirty percent or a possible transfer first to an individual and then to your principal or whatever appears most feasible". It would appear that someone had been consulted between these two letters.

16. From minutes of directors' meeting of December 13, 1949.

17. In the Doyle Hosiery Corp. case, supra, Doyle was president of the corporation and owner of 3,900 of 4,000 shares of common stock (the remaining 100 shares being owned by his wife and daughter). He handled the negotiations personally, prior to liquidation and sale. Yet it was held that Doyle was acting as a stockholder. The Doyle case may be distinguishable to some extent for the reason that the ultimate agreement signed by the corporation had been changed in some respects from the draft previously discussed with Doyle, while here the sale was ultimately made for the price which the partnership and Tribe had agreed upon. However, insofar as participation in the negotiations is concerned, Doyle, the president and virtual owner of the corporation, had been fully as active as Chester was here.

The primary purpose of the transaction was to accommodate Ben—to permit him to withdraw from the corporation and invest in another venture. For several years Ben had wanted to withdraw. This was discussed from time to time with Chester.[18] Chester had proposed to Ben the transfer of other properties in liquidation of his interest, but these properties were not acceptable to Ben. Because of his health and interest in an oil venture requiring substantial funds, Ben was more desirous by February, 1952, of liquidating his corporate holdings. The conveyance to him of a partial interest in the Duval-Wallace Building in liquidation of his interest in the corporation and the sale of the remaining interest by the corporation offered a means of accomplishing this purpose. It was a genuine liquidation and not a sham. Ben was not a mere conduit for a sale by the corporation. The corporation continued in business as a going concern after the partial liquidation.

 As the Supreme Court said in the Cumberland case, "The corporation tax is * * * aimed primarily at the profits of a going concern". It is true of course that *corporate* sales are taxed, even where the cash proceeds are at once distributed in liquidation. But no tax is imposed "on the liquidating distributions in kind or on dissolution". Here the purpose of the transaction was to liquidate the interest of a single stockholder in a closely held family corporation, not the sale by a corporation of its assets for the purpose of winding up its affairs or for some other purpose primarily for the benefit of the corporation. The corporation and remaining stockholders were concerned primarily with a practical plan for liquidating Ben's interest and providing him with the necessary

funds for his new venture. Under these circumstances, it cannot be said that the corporation made the sale as a going concern with respect to the 64% interest in the building transferred to Ben in liquidation of his stock in the corporation. The corporation should not accordingly be taxed on the portion liquidated and thereafter sold by the retiring stockholder. The fact that, in handling the transaction in this manner, the stockholders were also motivated by a desire to reduce taxes does not bar this conclusion.

It is my conclusion that the transfer to Ben represented a "genuine liquidation", and that under the rules set forth in Cumberland and other cases, supra, plaintiff is not subject to a capital gains tax on the interest so transferred.

---

18. There is some uncertainty as to whether Ben's desire to withdraw was discussed with Sarah. Chester testified that he had talked with Sarah about it several times and particularly in June, 1952, when a transfer to Ben of an interest in the Duval-Wallace Building was discussed. Sarah testified in a deposition that she did not know anything about the proposed sale of the Duval-Wallace Building or transfer of an interest to Ben until she came to Montana in the fall of 1952, after the transaction was accomplished. It was quite apparent from Sarah's deposition that her recollection of all matters relating to the corporation was vague and uncertain.