**LEWIS v. O'MALLEY, Collector of Internal Revenue.**

No. 12672.

Circuit Court of Appeals, Eighth Circuit.

Jan. 3, 1944.

William I. Aitken, of Lincoln, Neb., and Jay C. Halls, of Chicago, Ill., for appellant.

W. B. Waldo, Sp. Asst. to the Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key and A. F. Prescott, Sp. Assts. to the Atty. Gen., and Joseph T. Votava, U. S. Atty., of Omaha, Neb., on the brief), for appellee.

Before SANBORN, WOODROUGH, and RIDDICK, Circuit Judges.

WOODROUGH, Circuit Judge.

This action was brought by W. Glen Lewis against the Collector of Internal Revenue to recover a deficiency in income tax assessed against and collected from Mr. Lewis for the year 1936, on the ground that the exaction was illegal. On the trial of the case to the court without jury, the Collector rested at the conclusion of plaintiff's evidence and moved for judgment of dismissal. The court thereupon made comprehensive, detailed findings of fact and conclusions of law, accompanied by written opinion, and entered judgment dismissing the case at plaintiff's costs. Plaintiff appeals.

It appears that in the year 1936 the appellant was the president of the Lincoln Hatchery, a Nebraska corporation engaged in poultry hatching and sales on a large scale, and that he owned nearly all of the stock of the corporation and managed and controlled its affairs. He was the founder of the business and had brought about incorporation to obtain additional capital, but the success had enabled him to acquire all the stock issued originally to some twenty stockholders except five shares held by two of them.

The present tax controversy arose out of the investment, which he effected in 1936, of $50,000 of the corporation's funds (comprising all the cash the corporation then had) in two certain contracts issued by the Massachusetts Mutual Life Insurance Company. The contracts were in the form of policies of life insurance, insuring the life of Mr. Lewis in the sum of $50,000, and are referred to as "single premium" policies. The gross amounts which the policies promised to pay in the event of the death of Mr. Lewis were somewhat in excess of the amounts paid to the insurance company for the policies when they were issued, but it is clear that the $50,000 was not paid to the insurance company merely for the company's promise to pay in the future upon the happening of Mr. Lewis' death. Although they are properly referred to as insurance policies because of the life insurance feature contained in them, it is to be kept in mind that their main value to the purchaser resided in the loan and cash surrender values which were computed upon the basis of additions of dividends and of interest to the principal sum of $50,000 invested in them.

The $50,000 was paid to the insurance company by checks of the Lincoln Hatchery, drawn against its bank funds and entered on its books, and amounts of money were withdrawn from time to time by way of "loans" permitted by the policies, all such amounts being entered on the books of the Lincoln Hatchery at the time and applied to its uses. Some repayments of such loans were made with funds of the corpo-

ration, but ultimately the policies were surrendered and their value returned to the accounts and to the uses of the corporation.

It is undisputed that not a single dollar of the money involved in the issuance of the policies, the loans made thereon, or the values accounted for on surrender thereof inured to or was applied to the appellant's personal use, and the appellant made no reference to the transactions in his personal return for taxation for 1936. Deficiency was assessed against him on the conclusion of the Commissioner that the $50,000 paid to the insurance company for the policies out of the corporation's funds constituted distribution of dividend in that amount by the corporation to the appellant and, therefore, was income in that amount, received by and taxable to him under the Revenue Act of 1936, Sections 21, 22(a) and (d), and 115(a) and (b), 26 U.S.C.A. Int.Rev.Code, §§ 21, 22(a, e), 115(a, b). The element of life insurance in the contracts was not distinguished, valued or assessed, but the tax was laid in respect to the $50,000 investment.

On the trial the plaintiff adduced voluminous testimony showing all of the details of the transactions and the circumstances leading up to and surrounding the investment of the corporation's $50,000 in the contracts with the insurance company and the receipt and use by the corporation of all the proceeds of its investment. Although the documents showed on their face that Mr. Lewis was the applicant for the policies to whom the loan and surrender privileges were accorded by the terms of the policies, and that the person designated to receive in the event of his death was not the corporation, and that power to name those entitled to receive in the case of the death was reserved to him, he testified positively in respect to the purchase of the policies, "I was acting only as the agent of The Hatchery whose money I was using in the purchase of those policies", and that he did not intend and "the thought never entered his mind" to take the money paid for the policies out of the corporate business for his own benefit. There was no conflict in the evidence nor discrediting of any witness, and the purpose of the trial court in making the findings of fact comprehensive was to epitomize and marshal all of the evidence. We append the findings and assume them in the opinion.[1]

The appeal presents none of the difficulties so often present in tax cases where a single person owns an inactive holding

[1] "3. The Lincoln Hatchery, a corporation, is hereinafter referred to as 'The Hatchery'; The Massachusetts Mutual Life Insurance Company, a corporation, as 'The Insurance Company'; and The Christian and Missionary Alliance, an incorporated religious society, as 'The Alliance'.

"4. The Hatchery was incorporated in 1922 through the efforts of the plaintiff as a means of conducting upon an enlarged basis a poultry hatchery and sales business theretofore operated by the plaintiff as an individual in the city of Lincoln, Nebraska. From its inception the plaintiff owned all of its common stock, but at the outset and for several years thereafter several other persons owned and held some of its preferred stock. As resources were available to him the plaintiff had gradually acquired the preferred stock of other persons. In the first three months of 1936 he acquired from several parties the last outstanding substantial amounts of preferred stock, with the result that by May 9, 1936 he owned all but five shares of the par value of $50.00 each, four of which were owned by his former stenographer and were bought by him after preliminary negotiations on May 17, 1936, and one of which was owned by a nominal but inactive director of The Hatchery and was bought by the plaintiff on January 25, 1937. In 1936 The Hatchery had outstanding $15,000.00 in common stock and $35,000.00 in preferred stock.

"5. The plaintiff is a man of a dominant personality, well educated and for several years a college professor in scientific subjects.

"6. Though, during its earlier history, The Hatchery's directors other than the plaintiff were normally active in the way of holding meetings; the plaintiff, at all times, was its sole managing officer and had full charge of its business. As time elapsed and the plaintiff acquired a more nearly complete ownership of the stock, the directors and stockholders functioned less regularly. For example, the minutes of The Hatchery show no meetings, either of stockholders or of directors in 1936 and no stockholders' meeting in 1935.

"7. Throughout 1936, particularly from May 9, 1936 to the end of the year, The Hatchery was in possession of a surplus arising out of its earnings and profits, in an amount sufficient for the payment of dividends aggregating $50 000.04 without creating a capital deficit, if the amounts of

corporation and the problem is to distinguish between corporate and personal transactions for tax purposes. The Hatchery corporation is a very active business institution, employing many persons and facilities and considerable capital, and maintaining bank and commercial credit upon the customary disclosure of its business condition, including particularly its liquid resources material to commercial

the two checks of May 9, 1936 and July 10, 1936 (infra) be included among its assets.

"8. During 1936, the plaintiff was a married man, 51 years of age, the father of several children, and was and for several years immediately theretofore, had been sincerely and ardently devoted to and active in the religious work of The Alliance, of whose local society in Lincoln he then was and still is an active member. During 1936 also, the plaintiff and his wife were experiencing some domestic discord, the nature of which is not disclosed in the testimony before the court.

"9. On May 9, 1936, The Hatchery, with its check drawn and signed by the plaintiff in favor The Insurance Company for $25,000 paid The Insurance Company the full premium for a single premium ten year endowment life insurance policy. In like manner, on July 10, 1936, The Hatchery paid the sum of $25,000.04 as the full premium for a single premium ordinary life plan insurance policy. Each policy was issued on the life of the plaintiff as the insured, solely upon his individual application, designated 'The executors or administrators of the insured' as the beneficiary and contained a clause granting to the plaintiff the sole right (subject to any previous assignment) to change the beneficiary. The second policy was issued under an amendment of the application of May 9, 1936, pursuant to an insurance selling usage, whereby within a limited period after the initial application and medical examination an additional insurance coverage may be obtained under the same application and examination. In form, both policies were individual life insurance policies. In neither of them was there a grant or reservation of any right or interest, either present or prospective, in favor of The Hatchery which was an utter stranger to the terms of both policies.

"10. As of June 1, 1936, and about three weeks after the issuance of the earlier of the two policies and about six weeks before the issuance of the later one, the plaintiff in writing requested the redesignation of the beneficiary under the earlier policy in such fashion that in the event of the insured's death, the proceeds should be paid (a) contingent upon the survival during the installment periods of Norman R. Lewis, son of the plaintiff, the sum of $5,-000.00 to the said Norman R. Lewis in monthly installments of $100.00. and (b) any balance in one sum to The Alliance.

The Insurance Company noted this change upon the face of the policy on June 8, 1936. By endorsement upon the later policy as of July 23, 1936 the designation of the beneficiary was changed so that the entire proceeds of the policy as a death claim were made payable to The Alliance. Those redesignations remained effective continuously thereafter until the beneficiary in each instance was, by the plaintiff redesignated as 'The executors or administrators of the insured' on July 22, 1938 as to the earlier policy, and on September 30, 1940 as to the later policy, in each instance almost immediately before the surrender of the policy for its cash surrender value.

"11. On one prior occasion in its corporate history The Hatchery had purchased Life Insurance upon the life of the plaintiff. On July 9, 1931, it purchased from The Insurance Company for $20,005.50 a single premium five year endowment insurance policy upon his life, in which The Hatchery was the applicant, and the sole beneficiary and reserved to itself every right and benefit under the policy. It purchased that insurance as a method of preserving its available cash for recourse through loan privileges or conversion option, during its seasonal peak financial demands, and at the same time obtaining at least a small measure of insurance protection and interest return.

"12. From time to time during the life of the 1931 policy The Hatchery borrowed different sums of money upon it which were utilized temporarily in its business. In these borrowings some annoyance and inconvenience, alike to the plaintiff and to the Lincoln representative of The Insurance Company, arose out of the necessity of holding corporate board meetings of The Hatchery and obtaining certificates respecting its minutes and signatures of its officers upon the instruments evidencing and securing the loans. On some occasions, in consequence of the delay involved in holding meetings and supplying copies of records, the Lincoln agent of The Insurance Company advanced to The Hatchery temporary loans out of his personal funds, and on one of these occasions, himself borrowed money from a bank to enable him to make such an intermediate loan. The 1931 policy by its terms matured July 9, 1936.

"13. Shortly in advance, and in view, of the maturity of the 1931 policy, the Lincoln, Nebraska general agent for The Insurance Company discussed with the plaintiff the negotiation of a new policy

bank credit. It is proven beyond question that the investment of the corporation's cash in the insurance policies was carried on its books and held out at all times as a corporate asset available to creditors and stockholders. It had cash loan value of

but suggested to him the writing of individual insurance as a device for the obviation of the inconvenience that had been experienced in the course of borrowings upon the then current policy. It was out of this discussion that the issuance of the earlier of the 1936 policies immediately, and of the later one, ultimately, arose. However, The Insurance Company and its agent clearly intended, and the plaintiff also intended, that the new policies thus written should be written in the form in which they were written and should accord to the plaintiff full individual control over the policies; and all of said parties so treated and dealt with said policies in connection with (a) redesignation of beneficiaries; (b) the negotiation of policy loans, and (c) the ultimate surrender of the policies for their respective cash values, in all of which the plaintiff acted individually in his dealings with The Insurance Company.

"14. The 1931 policy was purchased by The Hatchery in pursuance of a general direction for the purchase of insurance upon the plaintiff's life made upon motion and vote of its board of directors. Absolutely no board action was taken respecting the acquisition of, or any dealing with the 1936 policies.

"15. After the issuance of The Hatchery's checks for insurance premiums in 1936, and on August 26, 1936, entries were made on The Hatchery's books to balance the checks precisely in the same fashion in which the 1931 transaction had been entered; that is, against the disbursements represented by the premium checks, entries were made to disclose as an asset of The Hatchery the initial cash surrender values of the policies, and as an insurance expense the difference between the premium checks and the cash surrender value.

"16. In connection with the 1936 premium payments no charges were made upon The Hatchery's books against the personal account of the plaintiff reflecting either enlarged salary, a loan, a gift or a distribution to him; no dividend was declared or other resolution for distribution adopted.

"17. After the procurement of the 1936 policies, the plaintiff personally and The Hatchery, through the plaintiff as its president made several financial statements to a Lincoln bank with which they transacted business for the purpose of obtaining credit, all of which were consistent particularly in this, that the corporate statements showed the cash surrender values of the policies as corporate assets and the individual statements did not reveal the large insurance holding as the plaintiff's prop-

erty. Likewise, in income tax reports subsequently filed, both The Hatchery and the plaintiff consistently treated the surrender value of the insurance policies as an asset of The Hatchery.

"18. From time to time after the issuance of the 1936 policies loans were negotiated by the plaintiff individually upon both of them in 1937 and upon the July 1936 policy in 1940. The May 1936 policy was converted into cash and surrendered in August, 1938, the July 1936 policy in October, 1940. These loans were advanced and the surrender values of the policies were paid by The Insurance Company's checks payable personally to the plaintiff, who in each instance promptly endorsed and delivered the checks to The Hatchery, and the only loan repayment was made by a check from The Hatchery direct to The Insurance Company. All such borrowings were entered in the books of The Hatchery as loans upon the insurance policies. The repayment check was likewise entered there as a credit upon such loans; and each of the receipts of cash from cash surrender values was entered on The Hatchery's books. In consequence of the loans upon and surrender of the policies the plaintiff now has no property in or proceeds from the policies which have been extinguished; and the full cash surrender values of the policies has been returned to The Hatchery.

"19. So far as The Hatchery is concerned no person connected with it, other than the plaintiff, participated in any manner in the acquisition of and payment for the 1936 policies, or in any action with respect to them except to the extent that its bookkeepers made the bookkeeping entries referred to in these findings, and these were made solely upon the plaintiff's direction.

"20. The plaintiff did not discuss the acquisition of the 1936 insurance policies with any one connected with The Hatchery, save in directing bookkeeping entries, and did not by any written instrument assign or assure to The Hatchery any right or interest in the 1936 policies or either of them.

"21. The plaintiff uniformly pursued the practice of paying his personal obligations out of The Hatchery's bank account, even to the extent of utilizing that account for his purchase of stock of other persons in The Hatchery. Sometimes such disbursements were made at The Hatchery's offices and by checks upon its regular check blanks; at other times they were made by counterchecks drawn elsewhere against The Hatchery's account by the plaintiff.

approximately $47,000 from its inception, fluctuating as loans were drawn out, repayments made, and interest and dividends accrued, and being the corporation's only liquid asset it constituted the real basis of the corporation's bank and commercial

Such disbursements were charged against a personal account of the plaintiff kept in a separate small book, the office checks when they were drawn, the counter checks when they were returned from the bank. In this book the check for $25,000.04 was, by the bookkeeper, entered as such a charge when it was returned paid by the bank, but the entry was promptly thereafter deleted at the direction of the plaintiff. The $25,000.00 check was never so entered.

"22. Apart from a temporary financial stringency incident to adverse general financial and credit conditions during a plant enlargement and building program in 1929, The Hatchery's business has consistently been prosperous. Yet, it has formally declared and paid only one dividend, and that in the autumn of 1926, concurrently with which it increased the amount of its outstanding preferred stock and the new offering was largely taken by the existing stockholders who utilized their dividends for its purchase. Hence, it really has never declared and paid a dividend in the usual and normal corporate fashion. However, as profits were realized, the annual salary of the plaintiff was largely increased. For some years his salary was $3500.00 per year, increased occasionally by a bonus as operating results justified. After 1929 he received $7500.00 per year for some time. Then, some time in 1936, according to the testimony, he began to receive salary at the rate of $12,000.00 per year, and even more recently has drawn as much as $30,000.00. For several years beginning before 1936 there has been no consistent record of directors' authorization of the salary of the plaintiff as president and manager.

"23. The designation of The Alliance as the beneficiary under the two 1936 policies was not a casual or isolated action. It was rather one step in the accomplishment of a manifest purpose on the plaintiff's part to divert the ultimate ownership of the entire hatchery business, constituting nearly all of his property to The Alliance rather than to his family. Further pursuing that purpose, the plaintiff in the spring of 1937 made a formal gift in writing of all of the stock of The Hatchery to himself as trustee for The Alliance and, thereupon, took the ordinary steps towards the vesting of the assets of The Hatchery in himself as trustee for The Alliance and the corporate dissolution of The Hatchery planning thereafter to remain in the management of the business at a substantial salary as an employee, but for the ultimate benefit of The Alliance. An action for a divorce, and

a separate proceeding in equity to cancel the transfer to The Alliance as a fraudulent invasion of her rights were promptly brought by his wife. The latter proceeding resulted, late in 1938, in a decree favorable to the wife, cancelling the transfer to The Alliance of the stock and property of The Hatchery and restoring the title thereto to the plaintiff herein. Thereupon, and early in 1939, the previously attempted corporate dissolution was formally rescinded and The Hatchery restored to its corporate operation. A reconciliation resulted in the abandonment of the divorce case.

"24. On or prior to March 15, 1937, the plaintiff filed with the defendant as Collector of Internal Revenue for the Omaha District his individual income tax return on Treasury Department 1040 for the year 1936 but did not report or return as income to himself the said sums of money paid by The Hatchery during the year 1936 for premiums for insurance on his life or any part thereof. The plaintiff duly and seasonably paid the tax computed on said return.

"25. Thereafter and on or about December 8, 1937 the Commissioner of Internal Revenue, duly notified the plaintiff of his proposal to assess against the plaintiff a deficiency in respect of his said income tax for the year 1936 in the sum of $12,501.06, and specified as the principal basis thereof the inclusion as additional income for said year to the plaintiff of the said sum of $50,000.04 in consequence of said insurance premium payments.

"26. The plaintiff duly filed his protest against said proposed assessment of deficiency tax but thereafter and on or about August 31, 1939 said protest was overruled and assessment was made against the plaintiff of a deficiency tax in the sum of $11,695.75, together with interest thereon.

"27. Thereafter and on or about January 16, 1940 the plaintiff, under written protest, paid to the defendant as Collector of Internal Revenue, the amount of said deficiency tax so assessed with interest thereon in the aggregate sum of $13,690.56, no part of which has ever been repaid to the plaintiff.

"28. On or about February 15, 1940 the plaintiff filed with the defendant as Collector of Internal Revenue a claim in due form for the refund of said payment so made as hereinbefore recited, which claim was, by the United States Commissioner of Internal Revenue, wholly denied and disallowed on or about July 10, 1940; whereupon, this action was filed seasonably and in due form."

credit. It also provided a sort of drawing account for the corporation where the interest payable on withdrawals needed for short periods was expected to be more than offset by the constant addition of interest and dividends under the policies. All of the bookkeeping entries in the books of the corporation reflect the value of the policies as an asset of the corporation and corroborate and are in accord with Mr. Lewis' assertion that he invested the corporation's money in the policies as the agent of, and for the use and benefit of, the corporation whose money he was using. Its value was consistently maintained and relied on as a corporate asset in the corporate records and statements.

The trial court made no finding that Mr. Lewis intended to segregate and take to his own use the funds of the corporation which he invested in the Massachusetts policies, but the court stressed the insurance policy form of the contracts according the loan and surrender privileges to Mr. Lewis, and that the beneficiary designated in the policies to receive in the event of Mr. Lewis' death was not the corporation, and that the power to designate such beneficiary was reserved to him and that he had exercised it by naming first his son and thereafter a certain charitable institution to which he at the time contemplated transferring the capital stock of the corporation. The court was of the opinion that the vesting of such powers in Mr. Lewis and his exercise of them had resulted under all the circumstances, in a transfer of the $50,000 from the corporation to Mr. Lewis so as to constitute a dividend received by him taxable as income.

But our conclusion is to the contrary. The widespread practice of insuring the lives of corporate officials for the corporation's benefit has given rise to many tax controversies over the insurance moneys paid upon the occurrence of death, but in this case the death of the insured named in the policies did not occur during the life of the policies. There were no insurance payments as such. Upon the issuance of these policies a cash fund was made available to and put to the uses of the corporation, augmented by accruing interest and dividends and no other person received any money out of the transactions directly or indirectly. The uncontradicted, positive evidence was that it was the corporation's investment for its use and we do not sustain the conclusion that it constituted a transfer of $50,000 from the corporation to Mr. Lewis by way of dividend. Nor do we think that the power to nominate a beneficiary, accorded to Mr. Lewis by the contracts, was intended to be or was an asset of value to him personally. His exercise of it first by naming his son, and thereafter by naming the charitable institution to which he then intended to transfer the capital stock of the corporation, appears compatible with his asserted intent to act as the corporation's agent in the whole transaction. He thought the corporation could not operate without this money and he intended, if he died, that the one stepping into his shoes as owner of the corporate stock would be in his position to carry on the business for the corporation just as he did.

But we need not and do not decide that Mr. Lewis' nomination of beneficiaries to receive under the policies in the event of his death was as a matter of law an act of the corporation for its benefit, nor do we consider what might have been the tax consequences if Mr. Lewis had died. In income taxation, no matter what form transactions may take, the inquiry must always go to the fundamental, whether the taxpayer really had income, and we find the controlling consideration determinative of this case is that Mr. Lewis did not receive for himself a single dollar of the corporation's $50,000, but that all of it was intended to be, and was, laid out for the benefit of the corporation and the proceeds applied to its uses as the owner. As he did not receive $50,000, he may not be taxed as though he had received income in that amount.

The exceptional cases in which the taxpayer is held to be taxable in respect to income constructively received by him, are not applicable here. Here there were no dividends coming from the corporation to Mr. Lewis which Mr. Lewis caused to be passed, without lodgement in himself, to some one else of his selection. On the contrary, the money invested with the insurance company, which included all the money the corporation had, was not considered by Mr. Lewis as an accumulation available for distribution. It actually was, and Mr. Lewis deemed it to be, operating capital of the corporation necessary to maintain the corporation's bank and commercial credit and to meet the seasonal demands of the operations of the business. Undoubtedly the act of Mr. Lewis in

making this investment for the corporation in his own name might have engendered tax consequences more complicated than the more customary holding of a piece of the corporate real estate in his own name for the same purpose, especially if he had died. But that contingency did not occur. The fact that Mr. Lewis intended, as he testified, that it should remain corporate operating capital and that it was so held out, used and applied, and that the corporation and not Mr. Lewis got the proceeds, prohibits a conclusion that the amount was transferred to him personally as a dividend.

It is contended for the Collector on this appeal that there are findings of fact made by the trial court binding on this court which compel affirmance, but we discern none. The court did not decide upon conflicts in the testimony of witnesses before it. It marshaled the uncontradicted testimony offered by the plaintiff alone. We are constrained to reverse its conclusion that Mr. Lewis received a dividend of $50,000 from the corporation because it has appeared to us that such conclusion is without support in the evidence and is contrary to the evidence and erroneous in law.

Reversed and remanded, with direction to enter judgment for plaintiff in accord with this opinion.