EDWARD D. LACEY AND LOIS C. LACEY, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 88383. Filed December 3, 1963.

*Louis Regenstein, Jr.*, and *Harry J. Mehre, Jr.*, for the petitioners.
*Winfield A. Gartner*, for the respondent.

---

OPINION

For each of the years 1951 through 1955, the respondent increased reported income of the petitioner by the amounts which were paid as premiums on the life of the petitioner by the company. The respondent included these payments in the petitioners' income under section 22(a), 1939 Code, and section 61 of the 1954 Code, relying on such cases as *George Matthew Adams*, 18 B.T.A. 381 (1929) ; *N. Loring Danforth*, 18 B.T.A. 1221 (1930) ; *Frank D. Yuengling*, 27 B.T.A. 782 (1933), affd. 69 F. 2d 971 (C.A. 3, 1934), and *Commissioner* v. *Bonwit*, 87 F. 2d 784 (C.A. 2, 1937), reversing 33 B.T.A. 507, certiorari denied 302 U.S. 694. Petitioner urges that these amounts were not taxable

to him on the ground that the corporation was the sole and complete owner of the policies and that he owned no interest in them whatever. *Lewis* v. *O'Malley*, 140 F. 2d 735 (C.A. 8, 1944). Respondent's position is that petitioner or his estate was the owner of the policies and that the policies were merely collateral assigned to the company for the purpose of securing petitioner's indebtedness to the corporation.

Petitioner offered the testimony of Lawrence Willet, C.L.U., to establish the different ways in which a corporation may take out life insurance on its key employees which the corporation intends to own. He stated that there are two generally known methods, namely, (1) by direct application in the name of the corporation, and (2) by means of an application by the insured with his estate designated as beneficiary, followed by immediate absolute assignment of the policies by the insured to the corporation. The latter method might be employed for a variety of reasons, one of which is the avoidance of any question as to the existence of an insurable interest in a corporation or as to the extent of such interest. See *Chapman* v. *Lipscomb-Ellis Co.*, 194 Ga. 640, 22 S.E. 2d 393 (1942), for an example of the type of litigation which may arise in relationship to the issue of insurable interest.

When it was determined the insurance would be taken out with Coastal, Eve sent an interoffice memorandum to Deloney on January 2, 1951, stating as follows:

Subject—Application: Edward Davis Lacey, Fairmount, Ga.—$50,000 dated 1/2/51—re above application, Beneficiary is noted as "Estate or Assigns": On issuance of policy please have Absolute Assignment forms completed in favor of Russell-Lacey Manufacturing Co., Fairmount, Ga. and mark to my attention to accompany policy.

Upon cross-examination, Deloney was asked if he made any recommendations in regard to the type of assignment that was to be made. He answered, "No, because I was told what they wanted and I followed those instructions. It has never been any question or intimation to be anything but an absolute assignment. I thought very clearly that this form provided just such an assignment."

Part of the testimony of Eve in relation to what he thought the forms accomplished is as follows:

Q: Did Mr. Lacey examine and approve these forms?
A: Yes. He read through them and as to—they were assignment forms, absolute assignment forms as far as he was concerned and as far as I was concerned, assigning them to the Russell-Lacey Manufacturing Company, with the full ownership vested in the corporation.
Q: It was your understanding that they were absolute assignment forms?
A: Yes.
Q: And that was Mr. Lacey's understanding?
A: Right.
Q: And that was what you both wanted?
A: Exactly.

Q: Now, in the event that they were collateral assignment forms, was that or not a mistake?

A: Well, frankly I didn't know that there was such a thing as a collateral assignment form at that time and I am not too sure that I knew about it until a couple of years ago. I was familiar with the use only, and had used before, absolute assignment forms.

Petitioner testified as to his understanding of the nature of the forms as follows:

Q: At the time Mr. Eve delivered the policy to you, did he deliver to you any other papers?

A: Yes.

Q: What other paper was that?

A: What I understood to be an absolute assignment form but Mr. Eve explained to me at the time that Coastal did not have those assignment forms and that he had taken this matter up with someone in their office and had gone to Fulton National Bank to pick up some blank forms and in the top corner he pointed out to me, 'As approved by the American Banking Association' and he said, 'We felt this form would be proper and adequate' and I signed my name to it.

\*       \*       \*       \*       \*       \*       \*

Q: Mr. Lacey, did Mr. Eve make any explanation to you as to the method that he was using in connection with the issuance of this policy?

A: Yes, sir.

Q: What was that explanation?

A: That from having consulted people in his firm, he felt that it would be proper to make the estate of E. D. Lacey as beneficiary with an absolute assignment to the corporation.

Q: And did you or not accept the statement and explanation of Mr. Eve?

A: I did.

Another interoffice memorandum, dated January 20, 1951, directed to A. A. Kroeg stated, in part, as follows:

Policy #30911 accepted by E. D. Lacey "as is". Delivery Receipt signed and Absolute Assignment forms completed.

There is conflicting testimony as to what is meant by the notations on the record cards of each policy. On the card for policy No. 30911 it is noted "Assigned Russell-Lacey Manufacturing Company; Fairmount, Ga., JCD—1-19-51" and on the space provided for endorsements on the card for policy No. 31755, there appears the notation: "Assigned to Russell-Lacey Mfg. Co.—JCD 5-11-51." Deloney, under whose direction such notations were made and whose initials (JCD) appear opposite such notations, testified that the intention of such notations was to signify absolute assignments of the policies.

In explaining these same notations, respondent's witness, Weldon, who became an employee of Coastal in 1954 succeeding to the position previously held by Deloney, stated that to him these notations indicated the policies were collaterally assigned, and that when there

is an absolute assignment, the record card would state "Absolute Assignment." He also testified the following:

Whether the procedure that I described was followed in 1950 and 1951, I can't say. I do know that since my coming with the company that has been the procedure.

We do not infer from this testimony more than that each man established his own system of notations to be used on the record cards to denote certain transactions.

Respondent introduced into evidence a copy of an interoffice memorandum dated July 29, 1952, from a clerk of Coastal to Eve which makes reference to such clerk's checking at Eve's request the files of Coastal with respect to policies No. 30911 and No. 31755 and showing she was "unable to locate the trust agreement you had drawn, leaving the proceeds of the policies in trust for Mr. Lacey's children." This was offered by respondent as evidence of ownership of the policies in petitioner personally. Eve, however, stated that his request had nothing to do with the policies in question, but rather it referred to a sample form of trust agreement which he personally had in mind for possible use in connection with a $25,000 "retirement income at age 60" policy which Eve sold to petitioner individually.

Respondent further points out that the premium notices themselves were addressed to the petitioner with duplicates sent to the corporation. A Coastal interoffice memorandum to Eve dated April 12, 1954, stated:

Since the policies are assigned to Russell-Lacey, we have arranged so that notices will be sent to the company, in care of the bookkeeper. You will recall Mr. Lacey requested that notices be sent to the bookkeeper. * * *

We do not think the procedure here followed is in any way significant.

Although petitioner's indebtedness to the company increased somewhat following 1951, it never amounted to more than a relatively small percentage of the combined value of his and his wife's interest in the company. We think it not of major importance that, in a two-family corporation such as this, security for a loan to a shareholder, much less than the value of his interest in the corporation, was not called for by the other shareholder family.

After examining the record with its numerous exhibits and having found the facts to be as stated above, it is our view that an absolute assignment was intended to be made and that complete ownership of the policies was intended to be in Russell-Lacey Manufacturing Co., Inc.

It is well established that this Court has no jurisdiction to grant equitable relief. *Lorain Avenue Clinic*, 31 T.C. 141, 164 (1958); *Emilie Furnish Funk*, 29 T.C. 279, 297 (1957). It is also established,

however, that State law will be applied in determining the rights or interests created in property, and that Federal law controls only as to the manner in which these rights or interests are to be taxed. *Fidelity & Deposit Co.* v. *New York City Housing Auth.*, 241 F. 2d 142, 144 (C.A. 2, 1956); *Laura Massaglia*, 33 T.C. 379, 383 (1959).

It is our view, upon the facts here presented, that the beneficial interest in the policies vested in Russell-Lacey Manufacturing Co., Inc. See *Prunier* v. *Commissioner*, 248 F. 2d 818, 820 (C.A. 1, 1957), reversing 28 T.C. 19. See also Rev. Rul. 59-184, 1959-1 C.B. 65, in which the Revenue Service stated that it will follow the Court of Appeals in *Prunier*.

While the *Prunier* case involved the Massachusetts law, we find no substantial distinction as to the issue before us under the Georgia Code of 1933, applicable sections of which read as follows:

37-205. Mistake of law by draftsman or agent.—A mistake of law by the draftsman or other agent, by which the contract, as executed, does not fulfill or violates the manifest intention of the parties to the agreement, may be relieved in equity.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

37-215. Error in form of conveyance.—If the form of conveyance shall be, by accident or mistake, contrary to the intention of the parties in their contract, equity shall interfere to make it conform thereto.

See also *White-Hamilton Lumber Co.* v. *Foster*, 157 Ga. 493, 122 S.E. 29 (1924); *Barnes* v. *Peterson*, 136 Ga. 264, 71 S.E. 163 (1911); *Allen* v. *Purcell*, 141 Ga. 226, 80 S.E. 713 (1914); *Whittle* v. *Nottingham*, 164 Ga. 155, 138 S.E. 62 (1927); *Niagara Fire Insur. Co.* v. *Jordan*, 134 Ga. 667, 68 S.E. 611 (1910); *Overland Southern Motor Co.* v. *Maryland Casualty Co.*, 147 Ga. 63, 92 S.E. 931 (1917).

Under the laws of Georgia an equitable assignment takes place when it appears, from the facts and circumstances, that a complete equity has arisen between the assignor and assignee, which will support an assignment, and the parties contemplated an immediate change of ownership of the property involved. Cf. *Jones* v. *Glover*, 93 Ga. 484, 21 S.E. 50 (1893); *Blount* v. *Metropolitan Life Insurance Co.*, 192 Ga. 325, 15 S.E. 2d 413 (1941).

In the light of the foregoing, we conclude that the courts of Georgia would have decided that an equitable assignment had occurred and that the Russell-Lacey Manufacturing Co., Inc., was the beneficial owner of the policies in question. It would appear, therefore, that the payment of the premiums by the company did not result in income to petitioners upon the facts before us. See *Prunier* v. *Commissioner, supra*, in which the Court of Appeals said, in part (p. 820):

We think the present case is more nearly like the type of case relied upon by petitioners. Despite the informality of the transactions, it seems to us that, in view of the facts in the record and of the findings by the Tax Court, the corporation would have been held to be the beneficial owner of the eight insurance pol-

icies under controlling Massachusetts law, and thus *could have obtained the help of a court of equity* to recover the proceeds of the insurance policies if one of the brothers had died in 1950. \* \* \* [Emphasis added.]

We hold, therefore, as indicated above, that the payments of the insurance premiums for the years in question did not constitute income to the petitioner and the deficiency determined for the year 1951 is barred by the statute of limitations.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

HOYT, *J.*, dissenting: I must respectfully dissent from the majority view. While the corporation may have been able to reform the collateral assignment into an absolute one and there is a finding that in the event of Lacey's death it was intended that the corporation should be the owner of the proceeds of the policies, I feel that the petitioners have failed to show that a Georgia court would have awarded the proceeds of the policies to the corporate owner rather than the named beneficiary. Absolute assignment may carry the ownership and the *right to change* the beneficiary, but *it does not change* the beneficiary.

There is no draftsman's mistake claimed or alleged as to the beneficiary named in the policies, and so at all times here pertinent if the insured had died the policy proceeds would have been paid to the insured's estate. There are also no buy and sell agreements or other contractual arrangements here that would establish the corporation's right to the policy proceeds. The case therefore seems far removed from the rationale of the *Prunier* case, and the Commissioner's acquiescence in its principles as announced in Rev. Rul. 59–184, 1959–1 C.B. 65, cited in the majority opinion. As far as this record discloses the corporation was not named as beneficiary and there was no arrangement to acquire the insured's stock upon his death. The taxpayer's estate, and thus his heirs and legatees, were entitled at all times to collect the policy proceeds. Under these circumstances I believe that premium payments for insurance on the life of a 50 percent stockholder-officer constitute additional income taxable in his hands, and I would therefore sustain the respondent's determination. Cf. *Paramount-Richards Theatres, Inc.* v. *Commissioner*, 153 F. 2d 602 (C.A. 5, 1946), affirming a Memorandum Opinion of this Court.

WITHEY, PIERCE, and MULRONEY, *JJ.*, agree with this dissent.