Richard J. NASSER and Argent Nasser,
his wife, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

No. 42544.

United States District Court
N. D. California, S. D.

Jan. 26, 1966.

December 18, 1963, claiming a refund of $29,223.41 for the year 1960 and a refund of $8,113.90 for the year 1961. Plaintiffs' claims for refund were disallowed by the District Director and the present action was commenced. Following the withdrawal of an additional deficiency notice, the court granted defendant leave to file a counter-claim in this action demanding judgment against plaintiffs for an additional deficiency in tax for the year 1961 in the amount of $36,233.98.

At the times of all transactions involved in this case, the plaintiff Richard J. Nasser (hereafter referred to as "Mr. Nasser") was the sole shareholder, president and one of the directors of a California corporation known as "Bay Properties, Inc." (hereafter referred to as "Bay").

Bay Properties prior to 1960 owned non-income producing property, the San Pablo lot, in conjunction with income property, the Shattuck properties which had depreciated down taxwise. Nasser was advised to sell the property and invest the proceeds in depreciable income.

On October 7, 1960, about the time that negotiations for the Continental Market began, the sum of $60,000 was withdrawn by check from the checking account of Bay and deposited in the personal savings account of Mr. Nasser at the Bank of America. The $60,000 payment to Mr. Nasser was entered by the bookkeeper, Garibaldi, on or about October 7, 1960, as the first entry in an account in Bay's books entitled "R. J. Nasser Loan for Refund." On March 2, 1961, the sum of $60,000 was returned from the personal savings account of Mr. Nasser to the checking account of Bay, because of the inability of Nasser to effect the intended purchase of the Continental Market.

On April 18, 1961, the sum of $30,000 was withdrawn by check from the checking account of Bay and deposited in the personal checking account of Mr. Nasser at the Bank of America. The $30,000 withdrawn from Bay's account and deposited in Mr. Nasser's personal checking account was used by Mr. Nasser partially to cover personal checks outstanding

Henry C. Clausen, San Francisco, Cal., for plaintiffs.

John M. Youngquist, Asst. U. S. Atty., for the United States.

MEMORANDUM OPINION

WOLLENBERG, District Judge.

This is an action for the recovery of Federal income taxes paid under protest by the plaintiffs Richard J. Nasser (hereinafter, "taxpayer") and his wife for the years 1960 and 1961. This court's jurisdiction derives from 28 U.S.C. § 1346(a) et seq. This opinion embodies the Court's findings of fact and conclusions of law as required by F.R.Civ.P. 52(a).

Plaintiffs are husband and wife and reside in San Francisco, California. The District Director audited plaintiffs' 1960 and 1961 joint returns and gave plaintiffs notice by letter dated October 14, 1963, of proposed assessments against them of deficiencies in taxes in the amount of $30,341.30 for the year 1960 and in the amount of $8,427.42 for the year 1961. Plaintiffs under protest paid the proposed deficiencies on December 18, 1963, and paid the accrued interest on the deficiencies on March 10, 1964. Plaintiffs filed claims for refund with respect to their deficiency payments for both years with the District Director on

on April 18, 1961, and partially to make purchases of shares of stock on the market in plaintiffs' names as their own personal investments. Between April 18, 1961, and December 21, 1961, said sum of $30,000 was consumed in such personal transactions; the balance in Mr. Nasser's personal checking account as of December 20, 1961, was $1,424.05. However, at all times during this period Mr. Nasser had over $200,000 in his savings account at the same bank.

On December 21, 1961, the sum of $40,000 was withdrawn by check from the checking account of Bay and deposited in the personal checking account of Mr. Nasser at the Bank of America. On December 1, 1961, a check was drawn on Bay's checking account in the amount of $10,000 payable to one Roy W. Stovall. This check represented a deposit toward the purchase price of $485,000 under a contract between Stovall as seller and Mr. Nasser as buyer for the purchase of a parcel of real property located in Millbrae, California, on which a supermarket was situated. This property is hereafter referred to as the "Continental Market".

On January 3, 1962, Mr. Nasser withdrew the sum of $181,000 from his personal savings account and deposited it in his personal checking account, and on January 4, 1962, he wrote a check for the sum of $226,332.60 payable to the California Pacific Title Company as escrow agent in the closing of the transaction for the purchase of the Continental Market. On January 5, 1962, two grant deeds conveying the Continental Market to Mr. Nasser alone were recorded with the Recorder of San Mateo County. The first of these deeds conveyed "an undivided interest of 89⅓%" to "Richard J. Nasser, a married man as his separate property" from "Roy W. Stovall" and is dated December 1, 1961. The second deed conveyed "an undivided interest of 10⅔% in the same property to "Richard J. Nasser, a married man as his separate property" from the "Garden Investment Company, a Limited Partnership" and is dated December 20, 1961.

After the acquisition of title to the Continental Market, Mr. Nasser in January of 1962 caused a separate set of books to be opened under the name of "Millbrae Continental", and the entries in those books reflect monthly receipts of rent from the lessee of the Continental Market and monthly mortgage payments on the $250,000 Nasser note having been made out of such rent receipts from January, 1962 through December, 1962.

On November 8 and November 15, 1962, an Internal Revenue Service agent called on Mr. Nasser at his office for the purpose of examining books and records reflecting the 1960 and 1961 withdrawal transactions in connection with the audit of the plaintiffs' tax returns for 1960 and 1961. On November 29, 1962, a meeting of the directors of Bay was held and minutes of that meeting set forth the fact of the purchase of the Continental Market in January of 1962, and stated that Mr. Nasser had taken title to the property in his own name for convenience, that it was understood at the time of the purchase that Bay should participate in the purchase to the extent that its available funds would permit, that Mr. Nasser had utilized $80,000 of Bay's funds in the purchase and had borrowed funds and put up his own funds for the balance of the purchase price, that the respective investments of Bay and Mr. Nasser in the property would be adjusted to two-fifths for Bay and three-fifths for Mr. Nasser, and that a two-fifths ownership interest in the property would be conveyed by deed to Bay from plaintiffs.

On December 19, 1962, a grant deed dated November 29, 1962, conveying "an undivided two-fifths interest" in the Continental Market from "Richard J. Nasser and Argent Nasser, his wife" to "Bay Properties, Inc., a California corporation" was recorded with the Recorder of San Mateo County.

On December 31, 1962, new accounts were opened in the books of Mr. Nasser and of Bay designated respectively as "Continental Market Investment" and "Investment Millbrae Continental Market", and opening entries were made in

those accounts to show Mr. Nasser's investment as $141,000 and Bay's investment as $94,000. The net income from the rental of the Continental Market for the year 1962 was on or after December 31, 1962, divided and credited on the Millbrae Continental Books on a two-fifths, three-fifths basis between Bay and Mr. Nasser. A "U. S. Partnership Return of Income—Form 1065" was filed with the Internal Revenue Service in 1963 in the name of "Continental Market" and signed by Mr. Nasser, showing the division of the rental income for the year 1962 between Bay and Mr. Nasser.

 In this case the ultimate issue is whether certain transfers of corporate money to plaintiff taxpayer constituted dividend income to him under the Internal Revenue Code. The legal characterization of these transfers under standards defined by federal law is the ultimate issue for decision. Chism's Estate v. Commissioner of Internal Revenue, 322 F. 2d 956, 960 (9th Cir. 1963), United States v. Loo, 248 F.2d 765 (C.A.9th 1957). Specifically at issue is the question of whether the "transfers" or "withdrawals" in 1960 and 1961 were "distributions" within the meaning of Section 61 and Section 316(a) of the Internal Revenue Code (26 U.S.C.1964 ed.) and therefore taxable as dividend income,[1] or whether the funds were transferred to plaintiff to be used by him as an investment agent on behalf of the corporation for its purposes and therefore not a dividend. Mertens Law of Fed.Inc.Tax. § 9.23.[2] It is settled that the burden is on the taxpayer to prove by a preponderance of the evidence that the specific transfer of funds determined by the Government to be dividend income was in fact a bona fide payment for a corporate business purpose. Adams v. Glenn, (W.D.Ky 1950) 42 AFTR 1356; Gurtman v.

United States, 237 F.Supp. 533, 535 (N.J. 1965); Welch v. Helvering, 1933, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212. In other words, the Commissioner's finding is presumptively correct and the taxpayer has the burden of proving the Commissioner's finding was erroneous. Gurtman v. United States, supra.

 The primary factual determination is recognized to be the *intention* of the sole-shareholder of the corporation *at the time the transfer is made*— Wiese v. Commissioner of Internal Revenue, 93 F.2d 921 (C.A.8th 1938), C.I.R. v. Makransky, 321 F.2d 598, 600 (3 Cir. 1963). To carry the burden imposed upon him the taxpayer must prove by a preponderance that he had a state of mind at the time of withdrawal which included a specific plan to use the money solely for the corporation's business. A vague, uncertain or indefinite intention as to repayment or use for corporate purposes at some time in the future is insufficient where the withdrawal places the money in the taxpayer's absolute control and subject to his absolute discretion as to its use. Gurtman v. United States, supra.

 In attempting to ascertain the taxpayers intention at the time of the transfer, the court must consider three types of evidence. First the testimony of the taxpayer himself which because of its self-serving nature is insufficient standing alone to carry the burden. Cf. Farenga v. Comm. (P.H. Memo T.C. § 55,279 (1955). Secondly, objective evidence which is contemporaneous with the transfer of funds is weighed to determine whether it corroborates the taxpayers asserted intention. Kaplan v. Commissioner of Internal Revenue, 43 T.C. 580, 595 (1965). Thirdly, evidence as to acts subsequent to the date of transfer may be considered in light of its consistency or inconsistency with the testimony as to

---

1. It is settled that a corporate distribution to a shareholder in order to constitute a dividend, need not be formally declared a dividend by the Board of Directors. Chism's Estate v. Commissioner of Internal Revenue, supra.

2. "Payments to a stockholder of funds to be used by him on behalf of the corporation for its purposes are obviously different from dividends. In such cases, the stockholder is a mere conduit or agent * * *"

original intent.[3] Baird v. Commissioner of Internal Revenue, 25 T.C. 387 (1955).

■■■■■ If the original intention of the taxpayer at the time of withdrawal is found to be a sufficiently definite corporate investment purpose, then the court must make a further inquiry into the actual use and disposition of the funds transferred to the taxpayers control in an attempt to determine whether the original corporate purpose was vitiated by such use and disposition. McReynolds v. Commissioner of Internal Revenue, 17 B.T.A. 331 (1929) ; Rosencranz v. Commissioner (P.H.Memo T.C. § 54,065; 1954). The original intent is not conclusive of the final or intermediate disposition of the funds. Furthermore, the substance of the particular withdrawal transactions and not the form controls the ultimate issue of the federal income tax consequences of the transactions. Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935). Neither the labeling of the withdrawals as loan accounts by the bookkeeper nor the final write-off of the account receivable in December, 1962 is conclusive documentary evidence of a corporate purpose for federal income tax purposes. The court must consider what the taxpayer did, not what he formally intended to do, nor what he declared by bookkeeping entries he had done. Lewis v. O'Malley, 49 F. Supp. 173 (D.C.Neb.1943) Rev'd on other grounds 140 F.2d 735. However, the formal bookkeeping entries and ultimate disposition of the funds may be given as much weight as they deserve in the particular circumstances of the transaction in the context of a close corporation. Lewis v. O'Malley, 8 Cir., 140 F.2d 735.

■■■■■ This court finds after a careful consideration of all of the evidence, exhibits, and oral testimony in the case that the transfer of $60,000 in October of 1960, the net transfers of $80,000 in 1961 were transfers made for a legitimate business purpose and that such transfers were not, at the time of withdrawal nor at any other time, distributions of dividend income within the meaning of Section 316(a) of the Internal Revenue Code of 1954 (26 U.S.C.) 1964 ed. The factors which led this court to its ultimate conclusion are discussed below.

Mr. Nasser's own testimony, the testimony of other witnesses, and independent evidence are consistent with a finding that the plaintiffs' original intention in all of the withdrawals was to employ the transferred funds as a fiduciary solely for corporate investment purposes. Bay Properties, Inc., prior to July, 1960 owned non-income producing property, the San Pablo lot, in conjunction with income property, the Shattuck properties, which had depreciated down taxwise. There is convincing evidence and independent testimony that Nasser was advised, as the corporate president to sell the lot and to re-invest the proceeds in depreciable income producing property for the benefit of the corporation. Testimony of Bunn, C.P.A.R.T. 27 ; Testimony of Garibaldi, Bookkeeper R.T. 152, 155 ; Corporate minutes of July 6, 1960 [4] (pl. ex.2) ; Letter of Rizzo to Internal Revenue Service (pl.ex.4) ; Testimony of Collier R.T. 126 ; Testimony of Rizzo, Vice President of Bank of America, (R.T. 27, 193, 206). There was evidence that the reinvestment plan was conceived as a logical tax saving project in order to avoid incurring a heavy income tax in favor of a less severe capital gain.

Additionally Nasser testifies to the informal authority granted by his family board of directors at the time of the transfers to carry out the investment project. R.T. 36, 142, 145. Mr. Nasser explained that he acted as an individual in the purchase in order to expedite the loan and to expedite the purchase. R.T. 39. His explanation was corroborated by

---

3. However, the probative value of steps taken after the close of the tax year and after the taxpayers return was first questioned by revenue agents must undergo progressive and measurable diminution.

4. The 1960 corporate minutes recite the corporate purpose to purchase income producing property.

the independent testimony of Rizzo[5] and Collier.

Furthermore at all times during which the transferred funds were deposited in Mr. Nasser's personal accounts, he had individual savings accounts with close to $300,000 in cash on hand. He testified that at no time did he need any money from Bay Properties for his own use. R.T. 47. The Government did not come forth with any evidence to the contrary. The court finds that the intent of Mr. Nasser at the time of the transfer of funds was to use such funds for corporate purposes as an agent of the corporation.

Although Mr. Nasser's original intent to employ the transferred funds for corporate reinvestment purposes was firmly enough established to avoid the imposition of a dividend tax, the Government asserts arguendo that the *actual* use of the money involved at some point incurred dividend consequences. McReynolds v. Commissioner, P.H.Memo T.C. 52,314 (1952). In other words, the Government urges that if the court were to look beyond the form of the various transactions involved and to make a careful step-by-step examination of each withdrawal, it would find that the earlier withdrawals which perhaps were not dividends ab initio were actually used for personal viz-a-viz corporate purposes.

The court finds after making an analysis of the evidence step by step that although Nasser's dealings with the corporation were extremely informal and although at various times Nasser had apparent unrestricted control over the funds, that at no point in all of the transfers involved was the overriding corporate purpose aspect of the transactions sublimated to a personal or private usage. In arriving at this conclusion the court was influenced by the following factors.

The on-again, off-again nature of the transactions explains to a large extent why the taxpayer, Nasser, transferred the corporate funds to his own account and why the funds remained in his accounts for long periods of time. The negotiations for the purchase of the Continental Market extended over a year-and-a-half period during which the deal wavered from hot to cold. In compliance with Rizzo's recommendations, Nasser withdrew the first $60,000 on October 7, 1960 and deposited that amount to his personal account (R.T. 39). This form was used for two reasons: to expedite the loan and to facilitate a quick purchase. The seller, Stovall was inconsistently eager then hesitant to sell but always insisted on a cash deal. (R.T. 38, R.T. 89). The real estate man, Collier, testified that Nasser had to be prepared to negotiate a cash deal when the iron was hot. (R.T. 228–230). The banker, Rizzo, had advised Nasser to take the title and to secure the loan in his own name with his own cash. Thus, at the end of the taxable year in 1960, which is the crucial date for tax purposes in regard to the $60,000 October, 1960 transaction the corporate funds were in transit in Mr. Nasser's bank account to be used for re-investment at the moment when the iron was hot. When the deal got cold the money was returned to the corporate account in March, 1961. The return of the funds in 1961 does not render the 1960 transaction non-taxable. However, it does tend to emphasize the on-again nature of the entire series of transactions. The same factors motivated the transfer of $30,000 in April, 1961 to Nasser's personal checking account when the deal grew "hot" again. Although this $30,000 was depleted by personal transactions entered into by Nasser between April and December of 1961, there were substantial funds in Nasser's savings account to cover the $30,000 of corporate funds in transit.[6] Ultimately the corporation was

---

5. Prior to any withdrawals, Rizzo, Vice President and Manager of the Bank of America advised Nasser to take title in his own name and later adjust and deed over to the corporation its part interest. Rizzo told Nasser this would expedite the

loan which might be needed quickly to close a purchase.

6. The Government argues that by using the $30,000 of corporate funds for his commercial transactions, Nasser was ac-

given full credit for the $30,000 when it received a two-fifths share in the Continental Market. The remaining transactions including the corporate check for $10,000 on December 1, 1961 and the withdrawal of $40,000 on December 21, 1961 were applied to the purchase price making the total of $80,000 credited to the corporation on account of its re-investment share in the Continental Market as of the time of taking title. (R.T. 47). There is nothing about the December, 1961 transactions which indicate either a change in intention or actual use by the taxpayer and they are therefore entitled to the same tax free treatment as the transactions discussed previously.[7]

Immediately upon the purchase of the Continental Market, a separate bank account was opened and separate books of account were set up for the Millbrae-Continental Company. The books into which all rent receipts were entered were separate from Mr. Nasser's personal books and similar to the corporation's other partnership books. R.T. 190. It is highly probable that had there not been an intent to include the corporation as part purchaser from the very beginning, rents would have been deposited to Nasser's personal bank account, would have been posted in his personal books, and no separate partnership type of book would have been set up for the partnership, Millbrae-Continental Company.

The court is further convinced that there was a corporate purpose in Nasser taking title in his own name as agent for the corporation. Rizzo testified that to expedite the loan and to expedite the purchase, he advised Nasser prior to October, 1960 to take title in his own name and then adjust the corporation's interest later. (R.T. 197, et seq.; 218). Rizzo's advice was based on the fact that Nasser was a well-known customer of the bank who could get the loan of $250,000 quickly as an individual but if a corporate application were involved there might be a delay in bank processing.[8] (R.T. 202). The delay (11 months) in transferring legal title from Nasser as sole owner to a co-ownership with the corporation was satisfactorily explained by Nasser and corroborated by independent testimony of Miss Garibaldi. (R.T. 146). It appears that both the accountant Bunn and Nasser's attorney, Ben Ham were ill during the eleven month period and that transfer of title was delayed until the annual audit at the end of the year. (R.T. 146, 155).

Ultimately by the end of 1962, the original corporate purpose was fulfilled when title to the purchased property, the Millbrae-Continental Market, was vested two-fifths in the corporation in accordance with its corporate contribution and three-fifths in Nasser in proportion to his personal contribution.[9] Thereafter,

cruing interest in his personal savings accounts which rightfully belonged to the corporation. Nasser testified that the corporation's share of the interest was to be adjusted later. R.T. 56. The court agrees with the Government that the interest earned should be credited to the corporation, Bay Properties, Inc. However, the court does not feel in view of other factors involved, that the earning of interest in Nasser's own account alone so modified the actual use of the transferred funds as to render them dividend income.

7. At all times during the various transfer of funds, the bookkeeper entered the sums withdrawn on the corporation books under a "Loan for Refund" heading. This heading was an invention of Miss Garibaldi, the bookkeeper. Mr. Bunn, the accountant listed the withdrawals in the

corporation's tax return as "Funds in Transit"—or "Advances to R. J. Nasser". (Pl.Ex. 6, Pl.Ex. 7). The labeling of these funds as non-dividend distributions by the bookkeeper and accountant are not conclusive of the federal tax characterization but they do tend to establish the taxpayers' continuing intention to act as a corporate agent in a reinvestment plan.

8. Rizzo confirmed this by pointing out that in the loan application Nasser's wife was not joined as an applicant and title to the realty went to Nasser, "a married man as his separate property" (Def's Ex.H) (R.T. 201).

9. The corporate contribution included Nasser's $80,000 withdrawals in question, with additional amounts to bring its total to $100,000.

the joint ownership of this realty, by the corporation and Nasser was treated as a partnership and a 1962 partnership return was timely filed in 1963. (Pl's Ex. 6, 10).

In aggregate, although I am aware that these various transactions involved a time period which extended from July, 1960 to December, 1962; that the transfers of funds into Mr. Nasser's bank accounts were subject to his control and discretion; and that the final placing of title in the partnership took place after an inquiry by revenue agents in the fall of 1962 into Mr. Nasser's tax return; however, for the reasons herein stated I am convinced that the plaintiffs have sustained their burden of proof in demonstrating that Mr. Nasser's original intention was to act as a corporate investment agent and that his actual use of the funds involved never vitiated that original intention. Accordingly, Judgment is hereby ordered in favor of plaintiffs, taxpayer, on their complaint and against defendant on his counterclaim. Plaintiffs' counsel shall submit an order of judgment in accordance with this opinion.