RUTH C. RODEBAUGH, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Rodebaugh v. Commissioner
Docket Nos. 4913-70
4914-70
4915-70
4916-70
4917-70
4918-70
4919-70
4920-70
United States Tax Court
T.C. Memo 1974-36; 1974 Tax Ct. Memo LEXIS 284; 33 T.C.M. (CCH) 169; T.C.M. (RIA) 74036; February 6, 1974, Filed. Albert B. Arbaugh, for the petitioners.
John P. Graham, for the respondent. 2 TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION
TANNENWALD, Judge:* In these consolidated cases, respondent determined *286 the following deficiences in petitioners' Federal income tax and additions to the tax under section 6651(a): [2] Docket No.
Petitioner
Taxable year ended
Deficiency
Addition 4914-70
Canton Sand & Gravel Co.
5/31/61
-
$ 191.32
5/31/62
$3,026.22
1,322.08
5/31/65
41,715.31
-
4916-70
Stark Sand & Gravel Co.
5/31/62
2,212.05
553.01
5/31/63
1,122.70
-
5/31/64
264.12
-
5/31/65
314.27
-
4918-70
United Sand & Gravel Co.
10/31/62
423.47
105.87
10/31/63
6,629.10
-
10/31/64
25,662.38
-
10/31/65
2,344.63
-
4920-70
Donald G. Rodebaugh and Ruth C. Rodebaugh
12/31/61
861.35
- 3 Petitioners in Docket Nos. 4914-70, 4916-70, and 4918-70 have conceded that they are liable for additions to tax under section 6651(a) in amounts *287 depending upon the deficiencies decided to be due in those respective dockets.
In Docket No. 4913-70, petitioner Ruth C. Rodebaugh has conceded that she is a transferee of assets of Canton Sand & Gravel Company and as such is liable under section 6901 for any deficiencies and additions to tax decided to be due in Docket No. 4914-70.
In Docket No. 4915-70, petitioner Donald G. Rodebaugh has conceded that he is a transferee of assets of Stark Sand & Gravel Company and as such is liable under section 6901 for any deficiencies and additions to tax decided to be due in Docket No. 4916-70.
In Docket Nos. 4917-70 and 4919-70, petitioners Donald G. Rodebaugh and Ruth C. Rodebaugh have conceded that they are transferees of assets of Lake Cable Sand & Gravel Company, which was a transferee of assets of United Sand & Gravel Company, and as such are liable under section 6901 for any deficiencies and additions to tax decided to be due in Docket No. 4918-70. 4 Petitioners have conceded some of the adjustments contained in the notices of deficiency. The following issues remain to be decided:
1. Whether certain income and deductions are to be allocated among the corporate petitioners in *288 accordance with the purported partnership agreement among them or as determined by respondent under section 482;
2. Whether the corporate petitioners must recognize ordinary income under section 1245 resulting from the sale of certain assets;
3. Whether petitioner Stark Sand & Gravel Co. is entitled to depletion deductions for its taxable years 1962 through 1964;
4. Whether petitioner United Sand & Gravel Co. is entitled to deduct expenses it paid in connection with the condemnation of certain property;
5. Whether petitioner United Sand & Gravel Co. is entitled to depreciation deductions in excess of those allowed by respondent for its taxable years 1961 through 1964 on an automobile it owned and made available to its president Donald G. Rodebaugh; and 5 6. Whether petitioner Donald G. Rodebaugh's gross income for 1961 includes amounts expended by United Sand & Gravel Co. and the purported partnership of which it was a member for certain travel and entertainment expenses and life insurance premiums.
FINDINGS OF FACT
Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference.
The individual *289 petitioners (hereafter referred to as Rodebaugh and Mrs. Rodebaugh) are husband and wife who resided in Solvang, California, at the time they filed their petitions herein. They filed a joint Federal income tax return for 1961 with the district director of internal revenue, Cleveland, Ohio.
The corporate petitioners (hereafter referred to as Canton, Stark, and United) were each Ohio corporations and had their principal offices in Canton, Ohio, during the years involved herein. They each filed Federal income tax returns for their taxable years 1961 through 1965 with the district director of internal revenue, Cleveland, Ohio. [3] 6 Lake Cable Sand & Gravel Co. (hereinafter referred to as Lake Cable), not a petitioner herein, was also an Ohio corporation and had its principal office in Canton, Ohio.
At all pertinent times, Rodebaugh was the sole shareholder of Stark, Mrs. Rodebaugh was the sole shareholder of Canton (either individually or as custodian for the Rodebaughs' minor children), the Rodebaughs together were the sole shareholders of Lake Cable, and *290 Lake Cable was the sole shareholder of United. Rodebaugh was the president of all four corporations.
Stark was incorporated in July 1958. It owned certain machinery and equipment at a location hereafter referred to as the Stark site. Such machinery and equipment were purchased from a company previously engaged in the sand and gravel business at that same location. On October 30, 1958, Stark obtained a long-term [4] lease from the fee owner of the Stark site, 7 granting it the right to mine, process, and remove sand and gravel from the leased premises in consideration of a tonnage royalty payable to the lessor.
Canton was incorporated on August 1, 1959. It owned certain machinery and equipment at a location hereafter referred to as the Canton site. Such machinery and equipment were formerly owned and used in the sand and gravel business at that same location by a corporation of which Rodebaugh was the president and a principal shareholder. Rodebaugh individually held a long-term lease (hereafter referred to as the Canton lease) from the fee owner *291 of the Canton site, granting him the right to mine, process, and remove sand and gravel from the leased premises in consideration of a tonnage royalty payable to the lessor. Canton never received an assignment or sublease of such rights from Rodebaugh.
Lake Cable was incorporated on October 1, 1959. It owned certain machinery and equipment at a location hereafter referred to as the Lake Cable site. Such machinery and equipment were purchased from an 8 individual previously engaged in the sand and gravel business at that same location. Since August 28, 1959, Rodebaugh individually held a long-term lease (hereafter referred to as the Lake Cable lease) from the fee owner of the Lake Cable site, granting him the right to mine, process, and remove sand and gravel from the leased premises in consideration of a tonnage royalty payable to the lessor.Lake Cable never received an assignment or sublease of such rights from Rodebaugh.
United was incorporated in 1929. It owned certain machinery and equipment at a location hereafter referred to as the United site. Lake Cable purchased all the stock of United on October 1, 1959. On September 1, 1959, the fee owner of the United site granted *292 a long-term lease (hereafter referred to as the United lease) to the Ohio Sand & Gravel Co. (an organization identified below), allowing it to mine, process, and remove sand and gravel from the leased premises 9 in consideration of a tonnage royalty payable to the lessor.
On August 1, 1959, Stark and Canton executed a partnership agreement, which provided as follows:
1. The parties agreed to form a partnership to be known as Ohio Sand & Gravel Co. (hereafter referred to as Ohio).
2. Ohio would employ all personnel necessary to process sand and gravel on behalf of each partner and would be responsible for all sales, management, production, maintenance of equipment, and billing.
3. Rodebaugh was employed as general manager of the partnership. The partners agreed to compensate him for his services on behalf of the partnership and to reimburse him for all travel and entertainment expenses incurred in connection with the proper discharge of his duties.
4. Ohio would have the right to the use of all machinery and equipment of each partner and would be respondible for the proper maintenance and operation of such machinery and equipment. 10 5. Each partner granted to Ohio the *293 right to excavate and remove sand and gravel from any lands from which they were authorized to do so by lease or other agreement. It was expressly understood and agreed that Ohio would not be obligated or responsible for the payment of any royalties for the removal of sand and gravel from any lands which might be under lease by the respective partners or for the performance of any of the terms of such leases.
6. The partners agreed that the net profits of the partnership would be distributed, and any losses would be borne, in the following proportions:
Canton 70%
Stark 30%
7. The partnership was to continue for a period of one year from the date of the agreement and be renewed from year to year unless changed by mutual agreement.
In September 1959 and October 1959, respectively, Lake Cable and United became members of the partnership on the same terms and conditions, except that the 11 partners agreed to share all net profits and losses as follows: Canton
50%
Stark
15%
Lake Cable
17%
United
18%
In November and December, 1959, Rodebaugh entered into negotiations with Canton Aggregate Co. (hereafter referred to as Aggregate) regarding the sand and gravel *294 interests of the Rodebaughs. On January 20, 1960, an agreement was executed by Rodebaugh, Stark, Canton, Lake Cable, United, and Ohio (all of whom were referred to therein as the First Parties) and Aggregate, the pertinent provisions of which are summarized as follows:
1. The preamble recited that Rodebaugh individually held certain sand and gravel leases, that Stark, Canton, Lake Cable, and United were engaged in the sand and gravel business upon leased premises in Stark County, Ohio, that those corporations had formed a partnership known as Ohio to engage in production, sales, and management on their 12 behalf and had granted to such partnership the right to use their machinery and equipment, and that Aggregate desired to purchase certain machinery and equipment belonging to those corporations and to lease the rest of their machinery and equipment and the right to remove sand and gravel from the various lands then occupied by those corporations.
2. Aggregate agreed to an immediate purchase from the First Parties of all inventory and certain machinery and equipment located at the previously mentioned sites.
3. Aggregate leased the rest of the machinery and equipment of the *295 First Parties for a term of ten years commencing February 1, 1960 and agreed to pay as rent for such machinery and equipment a sum equal to 12 percent of the gross dollar volume of sales of all materials removed from any of the sites.Minimum and maximum annual rental payments of $65,000 and $85,000 were specified. All such payments were to be made by a single check payable to Ohio, and Aggregate was to have no obligation to ascertain the proper apportionment of such payments 13 as between the individual and companies comprising the First Parties.
4. If Aggregate failed to make any such payments when due, the agreement would be null and void at the option of the First Parties and they would then be entitled to enter upon the premises and expel Aggregate therefrom and repossess the premises subject to the further right of the First Parties to recover from Aggregate all payments due for the balance of the lease term computed on the basis of the minimum payments specified.
5. Aggregate was granted an exclusive option to purchase the plant, equipment, and leasehold interests of the First Parties. Such option was to be exercised within a period of 90 days prior to February 1, 1965. *296 The option price was $650,000 less the aggregate of all sums paid or owed to the First Parties as rental payments under the terms of the agreement. 14 6. The First Parties further granted to Aggregate for a period of ten years commencing February 1, 1960 the right to remove all sand and gravel on the premises covered by the leases on the various sites, subject however to the covenants, provisions, rents, and royalties contained therein. Aggregate agreed to make all royalty and other payments required by the terms of such leases. At such time as Aggregate had paid to the First Parties the sum of $325,000 as accumulated payments under the terms of item 3 above, the First Parties would formally assign their interest in each of such leases to Aggregate. When and if such leases were assigned, the parties agreed to place, by a supplemental agreement, upon each of such leases a value so as to enable Aggregate to capitalize its investment therein.
7. Aggregate would have the right to make any alterations, changes, or additions to the various plants for the purpose of improving the qualities and quantities of the production, but any such improvements could not be removed at the expiration *297 of the term of the agreement and would become the property of the First Parties. 15 8. Aggregate agreed to pay all personal property taxes imposed upon the machinery and equipment located upon the various premises and due for the year 1960 and thereafter.
9. Aggregate would have the unrestricted right to hold itself out as being the successor to Ohio.
Aggregate thereupon took possession of the Canton, Stark, Lake Cable, and United sites and the machinery, equipment, and deposits of aggregate located there. Until June 1, 1964, it paid to Ohio the specified rents.
Ohio filed U.S. Partnership Returns of Income for the fiscal year ending May 31, 1961 through 1965. It reported rental income from Aggregate of $83,855.29 for the first such year and $85,000.00 for each of the next three years. Such income and the deductions claimed for those years were allocated among Canton, Stark, Lake Cable, and United in accordance with the profit-sharing ratio specified in their partnership agreement. [5]
*298 16 None of the rental payments made by Aggregate were allocated to Rodebaugh or reported by him on the Federal income tax returns he filed. Neither Rodebaugh, Stark, nor Ohio made any royalty payments on account of the sand and gravel leases in which they were named as lessees. Such royalties were paid by Aggregate directly to the respective lessors, as required by the foregoing agreement. Canton, Stark, Lake Cable, and United each separately claimed depreciation deductions on their Federal income tax returns for the taxable years 1961 through 1964 for the machinery and equipment they separately owned and together leased to Aggregate. No depreciation deductions were reported on Ohio's Federal partnership returns.
Aggregate engaged in the business of mining, processing, and selling sand and gravel at each of the four sites it leased and occupied. It operated the plants located at the Canton, Stark, and United sites for the production of ready-mix 17 concrete. Aggregate also operated the existing ready-mix asphalt plant located at the Canton site and installed an additional plant there to increase its capacity for producing that product. Aggregate discontinued operation *299 of the ready-mix asphalt plant located at the Stark site. In 1962, it also discontinued operation of all the existing machinery and equipment at the Lake Cable site and thereafter conducted only limited operations at that site using portable equipment for processing sand and gravel.
Listed in the descending order of their market prices, the materials produced and sold by Aggregate at the four sites were ready-mix asphalt, ready-mix concrete, gravel, and sand. The deposits of aggregate at the Canton site contained a plentiful supply of high-quality gravel, which is a primary component of ready-mix asphalt and concrete. In order to best exploit those deposits and minimize hauling costs, Aggregate 18 located its facilities for the production of ready-mix asphalt at the Canton site.Some of the gravel mined at the Stark and United sites was hauled to the Canton site and used in the production of ready-mix asphalt there. The value of such gravel was therefore reflected in the total sales figures for the Canton site rather than those for the Stark and United sites where such gravel was mined. The deposits of aggregate at the Lake Cable site consisted mostly of sand and, for that reason, *300 Aggregate discontinued production of ready-mixes at that site.
On February 28, 1964, a supplemental agreement was executed by Rodebaugh, Stark, Canton, Lake Cable, United, and Ohio (all of whom were referred to therein as the First Parties) and Aggregate, the pertinent provisions of which may be summarized as follows:
1. The preamble referred to the January 20, 1960 agreement and recited that Aggregate had made the payments and performed the other obligations 19 required of it under that agreement, that Aggregate had made payments aggregating the amount which entitled it to an assignment of the leases, and that Aggregate desired to exercise in advance of the date specified in that agreement the option contained therein to purchase such leases and personal property.
2. Such of the First Parties who were the lessees of the Canton, Stark, Lake Cable, and United leases agreed to execute and deliver assignments of such leases to Aggregate.
3. Such of the First Parties who were the respective owners of the personal property referred to and described in the agreement of January 20, 1960 agreed to execute and deliver bills of sale conveying full title to such property to Aggregate.
*301 4. First Parties agreed to accept Aggregate's exercise of the purchase option contained in the agreement of January 20, 1960.
5. Aggregate agreed to pay to the First Parties on June 1, 1964, as the purchase price under such option the sum of $278,863.80, being the price of $650,000 specified in the prior agreement less 20 credit for prior rental payments which had been made and would be made by Aggregate up to and including May 31, 1964 in the sum of $360,522.01 and a prepayment discount in the amount of $10,614.19.
6. The parties mutually agreed to waive performance of the provisions of the agreement of January 20, 1960 relating to the placing of valuations upon the various leases assigned to Aggregate. They further agreed that no allocation of the purchase price was being made by the First Parties and Aggregate as between any of the personal property and leases involved and that each party would make such allocation thereof as he or it should determine.
The supplemental agreement was implemented according to its terms on June 1, 1964.
The amount of $278,863.80 paid by Aggregate was apportioned among the four selling corporations according to the relative book values of the *302 plant 21 and equipment on the books of the respective corporations and not according to the profit-sharing ratio specified in their partnership agreement, as follows: Canton
$142,909.81
Stark
38,125.16
Lake Cable
29,955.14
United
67,873.69
Total
$278,863.80
The transaction was not reported by Ohio on its partnership return of income for the year of the sale, but was reported by the corporations on their respective corporate income tax returns. 22 Neither Ohio nor any of the four corporations paid Rodebaugh a salary after they executed the agreement with Aggregate on January 20, 1960. Since that time their only employee other than Rodebaugh was a part-time bookkeeper.
Contemporaneously with the 1960 agreement previously described, Rodebaugh entered into a separate oral agreement with Aggregate on January 20, 1960, in which he agreed to perform services for Aggregate for a period of two years. Rodebaugh introduced Aggregate's marketing personnel to potential customers in the area and otherwise assisted Aggregate in selling its products from the Canton, Stark, Lake Cable, and United sites. He traveled to the state capital and elsewhere to enter *303 bids on behalf of Aggregate for government contracts to supply roadbuilding materials. He also assisted Aggregate in obtaining additional sand and gravel leases in the Canton, Ohio area. Aggregate provided Rodebaugh with an automobile to use and reimbursed 23 him for all expenses he incurred in connection with his performance of these services.
During each of its taxable years 1961 through 1964, United owned an automobile which it made available to Rodebaugh and upon which it claimed depreciation deductions of $1,375.61 in its Federal income tax returns for each of those years. On April 14, 1961, Ohio paid a premium of $178.05 on an automobile liability insurance policy issued to it but covering United's automobile and naming United as the insured. During its fiscal year 1961, Ohio also paid and reported as deductions on its partnership return for that year amounts for oil, gasoline, tires, and other items relating to the operation of United's automobile, and additional amounts designated as travel and entertainment expenses. Rodebaugh used United's automobile for travel in connection with its own investment and business activities unrelated to the business of United. *304 24 During 1961, Ohio paid a premium of $3,039.36 on a policy of insurance upon the life of Rodebaugh. The Peoples Merchants' Trust Company, as trustee for the benefit of Mrs. Rodebaugh and the Rodebaugh children, was designated as the beneficiary. [6]
United owned a parcel of land adjacent to the United site. On October 31, 1960, United granted Aggregate the right to mine and remove sand and gravel from this property in consideration of a tonnage royalty payable to United. On January 10, 1963, United sold the fee interest in this property to Mrs. Rodebaugh. The State of Ohio had previously commenced proceedings to appropriate a perpetual easement for highway purposes over this property.The agreement of sale between United and Mrs. Rodebaugh provided that "all proceeds which [United] may receive as a result of the pending appropriation case * * * shall become the sole property of 25 [Mrs. Rodebaugh]" subject, however, to a prior assignment of such proceeds to a third party in the amount of some $68,500. In connection with the appropriation action, United and Aggregate agreed to share equally the expense of *305 having test borings conducted on the property to determine the quality and quantity of the deposits of aggregate located thereon. On September 18, 1963, United paid $2,240 for that purpose and claimed that amount as a deduction on its Federal income tax return for that year.
OPINION
1. Allocation of Lease Payments The first issue is the proper allocation among Canton, Stark, Lake Cable, and United of the payments which Aggregate made during the taxable years 1961 through 1964 for the use of their plant and equipment. [7] The four Rodebaugh corporations allocated the payments in accordance with the profit-sharing ratio specified in their purported partnership 26 agreement. [8] *306 Respondent has invoked the authority granted him in section 482 [9] to reallocate such payments among the four corporations in order clearly to reflect their income.
In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.
Initially, we must note the confusion and inadequacy of the record presented in this case - 27 elements which affact not only this issue but several other issues as well and which have imposed an undue burden upon us in attempting to distill the true facts.
Respondent argues that Ohio was not a valid partnership for Federal income *307 tax purposes. We find it unnecessary to confront this argument directly, since even if a valid partnership existed, section 482 may still be applied to reallocate taxable income among the partners, provided the requirements of that section are otherwise satisfied. Forcum-James Co., 7 T.C. 1195, 1213-1216 (1946), remanded by stipulation of the parties, 176 F.2d 311 (C.A. 6, 1949). See Grenada Industries, Inc., 17 T.C. 231 (1951), affd. 202 F.2d 873 (C.A. 5, 1953); Friedlander Corporation, 25 T.C. 70 (1955), and the concurring opinion of Raum, J., 25 T.C. at 81.
The requisite ownership and control of the entities in question is not disputed. The issue for decision is therefore whether the reallocation by respondent was "necessary in order * * * clearly 28 to reflect income * * *." On this issue, petitioners are faced not only with the usual burden of proof requirement ( Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure), but the principle established by the decided cases that respondent's allocation under that section may not be disturbed *308 unless it is shown to be arbitrary or unreasonable. Spicer Theatre, Inc., 346 F.2d 704, 706 (C.A. 6, 1965), affirming 44 T.C. 198, 206 (1964); American Terrazzo Strip Co., 56 T.C. 961, 970-971 (1971). Petitioners attempt to discharge their task by showing (1) that the allocation provided for in the partnership agreement rested on a valid foundation and (2) that the reallocations made by respondent are without such foundation. We think that petitioners have failed on both counts.
The allocation ratio provided for in the partnership agreement was, according to respondent, designed to effect an arbitrary shifting of income among the corporations in order to minimize the combined tax liability of the controlled group. The tax returns of Canton, Stark, 29 and United [10] show that the allocation chosen by them would indeed result in the elimination, or at least minimization, of their combined tax liability for the years involved. While such a consequence would not necessarily be fatal to petitioners' position, it does have a bearing in light of the state of the record herein. Thus, no evidence was submitted regarding the income and expenses *309 of the corporations prior to their agreement with Aggregate. Moreover, the only evidence regarding the reasonableness of the profit-sharing ratio specified in the partnership agreement was the unsupported testimony of Rodebaugh and the accountant for the corporations. They testified that the ratio was chosen with due regard for the relative quantity and quality of the aggregate deposits at each of the respective sites, the different production and hauling costs at each of the respective sites, and the value of the machinery and equipment located at the different plant sites. We are unable to rely 30 on such testimony, however, because of its vague and generalized nature and the absence of any corroborating data. In sum, while the record falls short of establishing that any shifting of income did in fact occur, neither have the petitioners carried their burden of proving the reasonableness of their own allocation.
Respondent reallocated the payments from Aggregate among the four Rodebaugh corporations in accordance with the relative gross dollar volume of sales from each of their respective plant sites. [11] *310 In support 31 of the reasonableness of using the relative sales figures as his criterion of allocation, respondent points to the fact that the variable payments required of Aggregate under its lease with the corporations were themselves dependent upon such sales figures.
Petitioners point to the fact that some sand and gravel from the Stark and United sites was hauled to the Canton site and used in the production of ready-mixes there. On this basis, they argue that respondent's formula operates to inflate the amounts of income allocated to Canton and deflate those allocated to Stark and United. Petitioners' testimony on this score was extremely general and lacked any specificity with regard to amounts of material *311 mined and processed or other pertinent data. Moreover, rather than implying such an arbitrary shifting of income to Canton, respondent's allocation can be interpreted as correcting an overstatement of Lake Cable's income possibly reflected in petitioners' allocation and restoring to Canton its proper share of the payments. In short, petitioners have not convinced us that respondent's allocation is arbitrary or unreasonable. 32 On the record before us, we must therefore find in favor of respondent on the first issue.
2. Section 1245 Income. The second issue is whether Canton, Stark and United must recognize ordinary income under section 1245 resulting from the sale to Aggregate on June 1, 1964. On their returns for the taxable year 1964, the three corporations reported the transaction as a sale of depreciable machinery and equipment. They now contend that a portion of the sales proceeds is allocable to the sale of their sand and gravel leases and therefore that the amount of ordinary income they must recognize under section 1245 is eliminated or reduced.
The simple refutation of the argument insofar as Canton is concerned is that Canton did not own a sand and gravel lease. *312 The Canton lease belonged to Rodebaugh. Therefore all the sales proceeds it received can be allocated only to its machinery and equipment. 33 Of more general applicablility is the fact that the terms of the agreements with Aggregate contradict the contention made by the corporations. The agreement of January 20, 1960 provided that Aggregate was entitled to an assignment of the sand and gravel leases as soon as it had made accumulated rental payments of $325,000. Aggregate had already satisfied that requirement by the time it exercised the option on February 28, 1964. On that date the holders of the leases were required to assign them to Aggregate without any further obligation on its part. In this connection, we think it significant that respondent has made no attempt to allocate to the machinery and equipment, in computing the gain involved herein, any portion of the rental payments which were credited against the option price. It would appear to be those payments which would constitute the amounts attributable to the leases if any such allocation were appropriate. 34 Finally, we think it peculiar, to say the least, that the provision of the January 20, 1960 agreement *313 obligating the parties to assign a value to the leases upon the exercise of the option was specifically waived in the February 28, 1964 agreement. There is nothing in the record which explains this apparent change in signals.
We hold that petitioners have failed to sustain their burden of proof and we sustain respondent's determination that the net sales price which Aggregate paid was entirely allocable to the machinery and equipment. 35 3. Depletion Deduction The thrid third is whether Stark is entitled to depletion deductions for its taxable years 1962 through 1964. On its returns for those years, Stark claimed a percentage depletion allowance for sand and gravel under section 613(b) (6) (A) equal to five percent of the payments it received from Aggregate for the use of its plant, equipment, and mining rights.
Respondent contends that Stark is not entitled to the claimed deductions because during the years involved it lacked an economic interest in the sand and gravel deposits at the Stark site. We need not decide that question, however, because, even if Stark possessed such an interest, it has failed to carry its burden of proving the amount of any depletion allowance *314 to which it is entitled.
Section 613(a) and (b) (6) (A) provide that the allowance for depletion in the case of natural deposits of sand and gravel shall be five percent 36 of the "gross income from the property." The gross income from the property is defined in section 613(c) as the gross income from mining, including treatment processes considered as mining. Section 613(c) (5) states that "blending with other materials" shall not be considered as mining.
On the record before us, we are unable to determine Stark's "gross income from the property" (i.e., the Stark lease) for purposes of the percentage depletion allowance under section 613. Respondent has ruled that amounts payable by a lessee based upon mineral production from the property under lease, whether attributable to extraction of the mineral or the use of leased mining equipment, are (under certain circumstances) includable in the lessor's gross income from the property for percentage depletion purposes. Rev. Rul. 68-361, 1968-2 C.B. 264. But even this ruling, assuming it is otherwise applicable, is insufficient to enable us to determine the amount of Stark's 37 gross income from the property in the *315 circumstances of this case. Some unknown portion of Stark's share of the payments from Aggregate must be attributed to the rental of Stark's machinery and equipment for the production of ready-mix concrete. We learn from Rodebaugh's testimony that the production of ready-mix concrete is a non-mining process involving the blending of sand and gravel with other materials and, therefore, machinery and equipment used for that purpose would not fit within the scope of respondent's ruling. We are thus forced to conclude that Stark has failed to establish the amount of any allowable depletion deduction.
4. Condemnation Expenses The fourth issue is whether United is entitled to deduct certain expenses it paid in connection with the appropriation action brought against a parcel of property it once owned but sold to Mrs. Rodebaugh prior to the time it incurred such 38 expenses. [12] The evidence shows that United not only sold to Mrs. Rodebaugh the fee interest in such property before it incurred the expenses in question but, furthermore, assigned to her its entire interest in any appropriation proceeds arising from the property. In these circumstances, the expenses must be considered *316 as payments made by the corporation for the personal benefit of Mrs. Rodebaugh rather than deductible expenses of its own business under section 162. 39 5. Depreciation Deductions The fifth issue is whether United is entitled to depreciation deductions in excess of those allowed by respondent for its taxable years 1961 through 1964 on the automobile which it owned and made available to Rodebaugh. Respondent allowed only 20 percent of the claimed deductions on the ground that United failed to prove that any greater proportion of the automobile's use was attributable to United's business rather than the personal activities of Rodebaugh.
United has failed to prove any connection between Rodebaugh's use of the automobile and its own business. Indeed, the nature of United's business during the years *317 in issue - the net lease of all its plant and equipment - would hardly seem to require any use of an automobile. Rodebaugh testified that he used United's automobile on Aggregate's behalf and for his own investment and business activities unrelated to the business of United. In respect of the former element, it is clear from the record that Aggregate's interests 40 were served by an automobile which that organization furnished Rodebaugh. Under the foregoing circumstances, we hold that United has failed to satisfy its burden of proof and apply the settled rule that no depreciation deduction is allowable for corporate property to the extent that it is devoted to the personal purposes of the corporation's shareholders. International Trading Co. v. Commissioner, 275 F.2d 578, 586 (C.A. 7, 1960), affirming a Memorandum Opinion of this Court; Fred W. Leadbetter, 39 B.T.A. 629, 634 (1939).
We sustain respondent's determination.
6. Constructive Dividends The final issue is whether Rodebaugh's gross income for 1961 includes amounts expended by United and Ohio, the purported partnership, for certain travel and entertainment expenses and life insurance premiums. *318 [13] Respondent contends that such expenditures 41 were for Rodebaugh's personal benefit and therefore includable in his income.
(A) Travel and Entertainment Expenses The first group of items are the disallowed portion of United's claimed depreciation deduction on the automobile it made available to Rodebaugh and the operating expenses of the automobile (including the payment of a premium on an automobile liability insurance policy) paid by Ohio. We have previously concluded that United's automobile was made available to Rodebaugh for purposes unrelated to the business of United or the purported partnership. In these circumstances, the disallowed depreciation and the operating expenses of the automobile are considered to be a fair measure of the personal benefit realized by Rodebaugh and therefore includable in his gross income. Estate of William F. Runnels, 54 T.C. 762, 767 (1970); Challenge Manufacturing Co., 37 T.C. 650, 663 (1962); *319 Rodgers Dairy Co., 14 T.C. 66, 73-74 (1950). [14] 42 The second group of items are the travel and entertainment expenses paid by Ohio. Insofar as the record discloses, these, like the automobile expenses, were payments unrelated to the business of the purported partnership and therefore includable in Rodebaugh's gross income. [15]
(B) Life Insurance Premium Respondent determined that the life insurance premium which Ohio paid is also includable in Rodebaugh's gross income for 1961. Ohio was the applicant for and owner of the policy on the life of Rodebaugh and had the right to change the beneficiary, which, during the year in issue, was a trustee for the benefit of Mrs. Rodebaugh and the Rodebaugh children.
On these facts, it appears that the policy was an asset of Ohio, available for its own business purposes and within the reach of the organization's creditors. Ohio's payment of the premium, *320 therefore, may not be considered as a constructive distribution to Rodebaugh. Casale v. Commissioner, 247 F.2d 440 (C.A. 2, 1957), reversing 26 T.C. 1020 (1956); [16] Edward D. Lacey, 43 41 T.C. 329 (1963). Compare David Centre, 55 T.C. 16 (1970), with Paul L. Frost, 52 T.C. 89 (1969). See also Lewis v. O'Malley, 140 F.2d 735 (C.A. 8, 1944).
If Rodebaugh had died while the trustee remained the beneficiary, in the absence of any exercise by Ohio of its right to change the beneficiary the trustee would have been entitled to the policy proceeds. On this basis, it can be argued that Rodebaugh's family received annually one-year term life insurance protection and that such protection constituted an economic benefit the cost of which was taxable to Rodebaugh. See Paul L. Frost, supra, 52 T.C. at 96; Rev. Rul. 64-328, 1964-2 C.B. 11, 15. Respondent has made no argument along these lines and accordingly we do not reach the issue.
Decisions will be entered
*321 under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Canton Sand & Gravel Company, Docket No. 4914-70; Donald G. Rodebaugh, Docket No. 4915-70; Stark Sand & Gravel Co., Docket No. 4916-70; Donald G. Rodebaugh, Docket No. 4917-70; United Sand & Gravel Co., Docket No. 4918-70; Ruth C. Rodebaugh, Docket No. 4919-70; and Donald G. Rodebaugh and Ruth C. Rodebaugh, Docket No. 4920-70.↩
*. Pursuant to a notice of reassignment sent to counsel for both parties, and to which no objections were filed, this case was reassigned by the Chief Judge on August 9, 1973 from Judge Austin Hoyt to Judge Theodore Tannenwald, Jr., for disposition.↩
2. Statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. ↩
3. The taxable years of the corporate petitioners will hereafter be denoted by the calendar years in which they end.↩
4. The phrase "long term" is used herein to describe a lease which had initial and renewal periods of fifteen years or more.↩
5. Ohio's returns for those years also report small amounts of other income identified only as "Miscellaneous" and allocated among the partners in the same ratio as the rental income. ↩
6. The trust instrument was not submitted in evidence.↩
7. Rodebaugh was also a party to the lease agreement with Aggregate and individually held the Canton and Lake Cable sand and gravel leases, but respondent has not sought to reallocate to Rodebaugh any of the lease payments made by Aggregate.↩
8. As indicated in our findings of fact, the final partnership agreement of Canton, Stark, Lake Cable, and United specified that the profits of the partnership were to be shared among them in the ratio of Canton 50%, Stark 15%, Lake Cable 17%, and United 18%.
9. SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS.↩
10. The tax returns of Lake Cable are not included in the record.↩
11. Respondent's allocation formula resulted in the following apportionment of the payments from Aggregate among the four corporations: 1961
1962
1963
1964 Canton
60.17%
54.14%
52.70%
49.78%
Stark
17.43
18.48
20.31
16.87
United
16.18
17.90
25.41
28.98
Lake Cable
6.22
9.48
1.58
4.37
Total
100.0%
100.0%
100.0%
100.0%
Petitioners do not dispute the sales figures used by respondent in making this allocation.↩
12. In addition to the $2,240 expense for conducting a test boring on the property (see p. 25, supra), United claimed as deductions two other expenses it allegedly incurred in connection with the appropriation action. Because United has presented no evidence or argument regarding the latter two expenses, we consider any claim in regard to those expenses to have been abandoned. ↩
13. The expenses paid by Ohio, presumably out of the payments which it received from Aggregate, were charged against each of the purported partners in accordance with the ratio specified in their agreement and accordingly deducted by each of the corporations in their returns.↩
14. Also see Whipple Chrysler-Plymouth, T.C. Memo. 1972-55↩. 15. The record herein does not permit a determination of any amount of offsetting expenses of Rodebaugh individually which might have been properly deductible under section 162 or 212.↩
16. The rationale of the Court of Appeals was accepted by the Court in David Centre, 55 T.C. 16, 20↩ (1970).